# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### September 11, 2007 Session

# TYRONE CHALMERS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-24695   W. Fred Axley, Judge**

---

**No. W2006-00424-CCA-R3-PD  - Filed June 25, 2008**

---

Capital Petitioner Tyrone Chalmers appeals as of right the judgment of the Shelby County Criminal Court denying his petition for post-conviction relief.  In 1997, the petitioner was convicted of one count of first degree felony murder and one count of especially aggravated robbery. The jury sentenced him to death after finding that the evidence of an aggravating circumstance, that the defendant was previously convicted of one or more felonies other than the present charge, whose statutory elements involve the use of violence to the person, see Tenn. Code Ann. § 39-13-204(i)(2), outweighed evidence of mitigating circumstances beyond a reasonable doubt. The trial judge imposed a sentence of twenty years for the especially aggravated robbery conviction, to run concurrently with the death sentence but consecutively to sentences previously imposed in another case.  See  State v. Chalmers, 28 S.W.3d 913, 915 (Tenn. 2000).  On April 19, 2001, the petitioner filed a pro se petition for post-conviction relief. An amended petition was filed on September 22, 2003.  An evidentiary hearing was conducted in August 2005.  On January 24, 2006, the trial court entered an order denying post-conviction relief.  On appeal to this court, the petitioner presents a number of claims that can be characterized in the following broad categories:  (1) the ineffective assistance of counsel and (2) the constitutionality of the imposition of a sentence of death.  Following a thorough and exhaustive review of the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Donald E. Dawson and Catherine Y. Brockenborough, Nashville, Tennessee, for the appellant, Tyrone Chalmers.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael Moore, Solicitor General; Mark E. Davidson, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Facts Underlying the Petitioner's Convictions

The proof, as set forth in our supreme court's decision, established the following:

At approximately 5:00 a.m. on August 20, 1994, the body of the African-American victim, 28-year-old Randy Allen, was discovered lying face down on the sidewalk next to Netherwood Street in Memphis. His pants and underwear had been pulled down around his ankles, and he had been shot five times. Two of the wounds, one to the head and another to the back, were fatal.

Ten days after the shooting, the 21-year-old African-American [petitioner] admitted to Memphis police that he had killed the victim during a robbery. The defendant stated:

I met up with "Dre" and "Black" on Orleans and So. Parkway near the park. "Black" was driving something like a[sic] Oldsmobile, "Dre" was in the front passenger seat and I got in the back seat. We were just riding around looking for somebody to rob. I had some kind of automatic rifle, it had a clip in it, black and brown color. "Dre" had a .380 automatic or something, look [sic] black to me. I think "Black" had a shotgun. "Black" was driving down Netherwood, and me and "Dre" jumped out on two boys. We tried to rob them. We made them strip, then I had hit the one that was killed with the rifle and it went off, and I couldn't let the rifle go. Then me and "Dre" jumped in the car and left, with "Black" driving. Then "Black" dropped me and "Dre" off near a house, close to Southside School.

The [petitioner], who robbed Murphy and the victim of $3.00, estimated that he had fired six times. The [petitioner] concluded his statement by remarking, "I'm sorry it ever happened. If I could go through it again, I wouldn't."

Based on this proof, the jury convicted the [petitioner] of felony murder and especially aggravated robbery.

During the sentencing phase, the State introduced evidence of the [petitioner]'s previous convictions for attempted especially aggravated robbery and attempted first degree murder for a criminal episode occurring on the same date as the present offenses. The Deputy Clerk for the Shelby County Criminal Court Clerk's Office testified that, according to the court records, Tyrone

Chalmers was convicted of attempted especially aggravated robbery and attempted first degree murder on July 8, 1996, for offenses committed against Joseph Hunter on August 20, 1994. During cross-examination, defense counsel contested the clerk's identification of the [petitioner], asking, "[Y]ou have no way of knowing whether or not those documents that you have are in fact, belong to [sic] Tyrone Chalmers, do you? You have no personal knowledge yourself, do you?" Hunter, the victim of those prior crimes, then testified that he was driving home at approximately 2:55 a.m. on August 20, 1994, when the [petitioner] stepped in front of his car, pointed a rifle at him, and told him to "give it up." According to Hunter, the [petitioner] fired approximately fifteen rounds at him as he drove away, striking Hunter in the leg and arm.

The [petitioner] presented the testimony of his mother and sister. His mother testified that the [petitioner] was one of seven children, had graduated from high school, and had never given her any trouble. At the time of these offenses, the [petitioner] was employed and was caring for his mother who suffered from diabetes. The [petitioner]'s sister described the [petitioner] as "a very caring person" and her best friend. She conceded that he had been in juvenile court once but claimed that the victim of that offense had "actually committed a crime" against the [petitioner].

The last witness was the [petitioner], who testified that only hours before he committed these offenses he had been drinking alcohol and had smoked crack cocaine for the first time. He claimed that he could not remember what happened but did recall that the gun he used belonged to one of the accomplices. He admitted having been in juvenile court but asserted that the only criminal charges he had ever faced were those arising from the events of the early morning hours of August 20, 1994. The [petitioner] told the victim's family that he was sorry and expressed his desire to take the victim's place if he could. On cross-examination, the [petitioner] admitted that he tried to rob Hunter before he ever met up with Dre and Black.

State v. Chalmers, 28 S.W.3d 913, 915-17 (Tenn. 2000).

**Proof at Post-Conviction Evidentiary Hearing**

A hearing on the petition for post-conviction relief was held in the Shelby County Criminal Court August 15 through 17, 2005. During this hearing, the following proof was presented.

Linda Kendall-Garner, a Memphis attorney, testified that she first became involved in the petitioner's case when appointed counsel, Janice White, became ill in 1996. Ms. Kendall-Garner became responsible for part of Ms. White's docket, and the petitioner's case was part of that designated portion. Eventually, the trial court appointed Ms. Kendall-Garner to replace Ms. White. At the time of her appointment, Ms. Kendall-Garner had no experience in death penalty litigation. Although she had attended numerous continuing legal education courses and seminars

directly related to criminal practice, she could not recall reading any manuals regarding capital litigation. Ms. Kendall-Garner testified that she had previously been retained in one case where the death penalty was initially going to be sought; although, in the end, an offer was made.

Ms. Kendall-Garner further testified that she had sat in on murder trials with Kenny Armstrong, Floyd Peete and D'Army Bailey. She admitted that she did not have an active role in these trials. Ms. Kendall-Garner did state that, since the day she "got out of [law] school," she has had "major felony trials."

Ms. Kendall-Garner admitted that, at the time of her appointment, she was not familiar with the "A[B]A guidelines for representation of clients in death penalty cases." She was also unfamiliar with the three volume set entitled "Tools for the Ultimate Trial" published by the [Tennessee] Association of Criminal Defense Lawyers. However, she was aware that she needed a second chair attorney. She also understood the concept of a "defense team," which she described as a group of lawyers who handles the case, and duties were delegated among the lawyers according to their practice skills.

Ms. Kendall-Garner testified that Mr. Johnson was appointed as second-chair counsel on this case. She stated that she was accustomed to working with Mr. Johnson. She stated that, although she was lead counsel, she deferred to Mr. Johnson, stating that he "had far more knowledge than I with respect to the trial of a capital case." She could not recall the process as to how they divided the work to be done. She agreed that she handled the suppression hearing, the voir dire, the cross-examination of Lieutenant Woods, and the closing argument at the guilt phase. Mr. Johnson handled all the other witnesses, as well as opening statements in both the guilt and penalty phases.

Ms. Kendall-Garner stated that she was also appointed to represent the petitioner in the Hunter case, the case that would ultimately be the sole aggravating circumstance in his capital case. She further affirmed that the State filed its notice to seek the death penalty four days after the petitioner entered a guilty plea in the Hunter case. Regarding this case, Ms. Kendall-Garner recalled the descriptions of the perpetrator provided by the victim. In the August 20, 1994, police report, the victim described the suspect as wearing a trench coat. The victim further described the suspect as a "[m]ale black 29, 5'11", 127 pounds, skinny build, medium complected [sic], black hair with corn rows, dirty in appearance, medium goatee and mustache." On September 19, 1994, in a typewritten statement, the victim described the suspect as "a black male with a trenchcoat over his head . . . [m]ale black, five eleven, 175 pounds with cornrows in his hair going to the back, medium complexion approximately twenty to twenty-one years old and he was wearing a beige trenchcoat, blue jeans, and tennis shoes." The record of arrest indicated that the petitioner was twenty-one years old, black male, height five-ten, weight 180, hair black, eyes brown, complexion medium."

Ms. Kendall-Garner testified that, at no time, did the petitioner ever deny that he had been the person shooting at Mr. Hunter. She stated that the petitioner wanted to enter a guilty plea to this offense. It was his desire never to go to trial on this matter. Notwithstanding the petitioner's desires, Ms. Kendall-Garner asked the trial court for a continuance. She maintained

-4-

that her position was that she could not permit him to enter a guilty plea in this case when he had another murder case pending. Ms. Kendall-Garner also discussed the impact a guilty plea in the Hunter case would have on his pending murder case; in other words, she informed the petitioner that a conviction in the Hunter case would be the aggravator that would make him death-eligible in the murder case. Despite this information, the petitioner indicated that he still intended to enter a guilty plea in the Hunter case. In July 1996, the petitioner entered his guilty plea in the Hunter case.

Regarding her representation of the petitioner in the capital case, Ms. Kendall-Garner testified that she consulted with Mr. Johnson. She met with the petitioner "at length." Ms. Kendall-Garner obtained the files of former counsel Janice White. She attempted to locate witnesses discussed by the petitioner. The petitioner mentioned a man named "Black." Ms. Kendall-Garner testified that "[she has] no idea to this day who Black is." She explained that the petitioner did not provide her with a last name. She conceded that she did not have an investigator in this case. She explained that "I had no facts available to me where I found a pressing need for an investigator in order to prepare for the trial." She also did not communicate with the investigator who was handling the Andre Ragland case. She did talk extensively, however, with Mr. Ragland's attorney, Ron Johnson.

Ms. Kendall-Garner identified a memo written by Ralph Nally, an employee of the Public Defender's Office. This memo summarized an interview taken on July 13, 1995 with Darren Murphy, a friend of the co-defendant Ragland. This interview indicated that Mr. Murphy believed that the victim, Mr. Allen, was selling drugs that night. Ms. Kendall-Garner stated that she did not judge this information as being helpful to the petitioner's case. She admitted that her investigation was limited to trying to find out who these individuals were. She had access to and reviewed Andre Ragland's statement. Andre Ragland indicated that there were three of them involved: himself, Black and the petitioner. Ms. Kendall-Garner also reviewed the statement of Marlon Murphy, the other victim that night. She recalled that, originally, the petitioner and co-defendant Ragland, were to be tried together. However, co-defendant Ragland ultimately entered a guilty plea. Ms. Kendall-Garner never made any attempt to interview Andre Ragland. Ms. Kendall-Garner recalled that the petitioner's version of the facts surrounding the incident were that "he hit Mr. Allen with the gun and the gun kept firing." She conceded that she made no attempt to confirm the veracity of this statement.

Regarding her preparation for the sentencing phase, Ms. Kendall-Garner stated that she and Mr. Johnson met with the petitioner's family. She had previously discussed with Janice White what kind of student the petitioner had been. She also knew that he had worked at Wendy's restaurant. Ms. Kendall-Garner and Mr. Johnson talked with the petitioner's sister and mother about the petitioner's academic performance. The petitioner's sister testified, as did the petitioner. Ms. Kendall-Garner stated that she never met with the petitioner's father. She recalled that they discussed the petitioner's school records. His mother stated that the petitioner was an average student. His mother added that he had never given her any problems and that he worked and took care of her. Ms. Kendall-Garner recalled that, during these interviews, there was no mention about a family history of alcoholism. Ms. Kendall-Garner stated that they were

never in a position to gather information regarding the lifestyle of the petitioner's father, Johnny Chalmers. She stated that Johnny Chalmers refused to meet with them.

Ms. Kendall-Garner did not recall reviewing the petitioner's Memphis City School records or a report titled "Memphis City Schools Mental Health Center, Professional Report." She also did not recall reviewing the petitioner's "notice of placement, parent response to the division of special education." However, she stated that she reviewed something "familiar" to this when reviewing Janice White's files. Ms. Kendall-Garner remarked that she did not find it remarkable that the petitioner was a C-student. She further stated that "special education doesn't necessarily mean that you are not able to participate effectively in your defense." She conceded that she was unaware the petitioner had been diagnosed as having a developmental expressive writing disorder. She commented that she was not of the opinion that a writing disorder was relevant as a mitigating factor. She stated that neither she nor Mr. Johnson considered having an educational specialist or someone with a psychological or psychiatric background examine the petitioner for mitigating evidence. She stated that they discussed the possibility but that, based on the information she had, they saw no need for a specialist.

Ms. Kendall-Garner stated that the issue of the petitioner's reading comprehension was never discussed in relation to his motion to suppress. Notwithstanding, the motion to suppress filed by Janice White mentioned the fact that "[the petitioner's] reading comprehension is so limited he is unable to understand the contents of the documents that he signed . . . being his confession or admission of guilt." Ms. Kendall-Garner maintained that there was no indication from the petitioner that his reading comprehension was relevant to the motion to suppress. Rather, the petitioner informed her that "he did give a confession. He did not say he didn't understand it nor did he say that it wasn't true." She stated that the petitioner's complaint was that the "police officers beat him on the head with a telephone book which he called the book of knowledge."

Ms. Kendall-Garner explained that, although the statements for the Hunter case (the non-capital offense) and the Allen case (the capital offense) were made within an hour or so of the other, the petitioner did not feel anything improper happened during his statement in the Hunter case. While she admitted that brain damage or other disorder may affect the admissibility of a statement, she stated that they had no evidence that the petitioner had ever been diagnosed with any kind of brain injury affecting his ability to read, understand, or verbalize his thoughts. She stated that, because the petitioner was a C-student, "no red flag" was raised that would have triggered her to look behind the school records. Ms. Kendall-Garner conceded that she never talked with any of the petitioner's teachers. She did talk with the petitioner's employer at Wendy's restaurant. She stated that he was employed there for less than a month. Ms. Kendall-Garner stated that she was not aware of the petitioner's employment as a welder at Zip Products.

Ms. Kendall-Garner informed the petitioner "point blank" that she felt certain that he would be convicted if they proceeded to trial and advised him to consider the plea. In preparing for the sentencing phase, Ms. Kendall-Garner talked to "those sources that were the closest to him," his mother, his sister. She did not talk with the petitioner's brothers, Jack and Robert. The petitioner's mother was asked about the petitioner, what kind of son he was, the environment he

lived in, and how he took care of his mother. Ms. Kendall-Garner related that she never heard any fact that indicated that he lived in an environment so damaging that he was unable to appreciate the wrongfulness of his conduct. She further admitted that she did not limit herself to issues that affect whether the petitioner appreciates the wrongfulness of his act.

Ms. Kendall-Garner admitted that she could have put on evidence that the father would not come to court because he felt that he needed to get his food stamps. The petitioner's mother did testify that the petitioner was a good son and that he took care of her. Prior to these present incidents, the petitioner "had not had a mentionable criminal history." She stated that she did not investigate the criminal histories of the petitioner's family members. She conceded that she was not aware of murders committed in the petitioner's immediate neighborhood nor was she aware that the petitioner had been shot in the leg. In this regard, Ms. Kendall-Garner stated that "[i]f the client doesn't tell the attorney something that puts the attorney on notice that there is some area that needs further investigation, then how would the attorney know to do those things." She then conceded that she did not talk to other people in the petitioner's neighborhood.

Ms. Kendall-Garner did not subpoena the medical records of the petitioner's mother. In her professional judgment, she did not feel that the records were relevant. She had information that the petitioner took care of his mother, who suffered from diabetes. Ms. Kendall-Garner stated there was nothing to indicate that the petitioner's mother was not following her instructions.

Ms. Kendall-Garner conceded that she was unaware that the petitioner's father was a gambler, used drugs, or was a drinker. She admitted that she was not aware that the petitioner's father was charged with murder in 1975. Ms. Kendall-Garner stated that she never visited the petitioner's home. She stated that the fact that "the projects were five doors down the street" from the petitioner's home would not have raised any "red flags" to her because she, herself, grew up "five doors down the street" from the projects.

Regarding Ms. Kendall-Garner's conduct of the voir dire, she stated that they wanted to know about particular biases or prejudices of the jurors. She wanted to know whether they had been victims of crime and wanted to know where they lived. Ms. Kendall-Garner related that "ideally you want to know all of the things – everything there is to know about a potential juror that might bear on your client's case to get him the most favorable result." She stated that she was able to rehabilitate two or three jurors who initially stated that they were not able to impose a sentence of death. She conceded that she was not familiar with the term "automatic death jury or juror." She further admitted that she was not familiar with the case of Morgan v. Illinois, 504 U.S. 719, 112 S. Ct. 222 (1992), which held that, to be qualified as a juror, you must be able to consider and give effect to mitigation. She could not recall to what extent the remaining jurors were able to consider and give effect to mitigation evidence.

On cross-examination, Ms. Kendall-Garner explained that this case originated in 1994. The petitioner was originally represented by Janice White for almost two years. In 1996, Ms. Kendall-Garner was appointed, and the case went to trial in 1997. She related that Ms. White had reviewed the petitioner's school records and had interviewed the petitioner and his family.

-7-

Ms. Kendall-Garner stated that the petitioner never indicated that his statement provided to the police was incorrect. Rather, the petitioner's only complaint was that the police had hit him with a telephone book and forced him into providing a statement.

Ms. Kendall-Garner stated that she did not have a problem communicating with the petitioner. She stated that she could understand the things he said, although he was sometimes quiet. There was no indication that he had a problem understanding her or the nature of the proceedings against him. At no time was there any indication to Ms. Kendall-Garner that the petitioner had a problem that needed to be addressed by an expert. The petitioner's family never indicated that he had any mental or behavioral problems nor was there anything in Janice White's records to indicate that the petitioner was incapable of assisting in his defense.

As mitigation proof, the defense team presented the testimony of the petitioner, his mother, and his sister. The strategy was to show a side to the petitioner that was "endearing." He took care of his mother, went to school, and was an average student. The petitioner had never been involved in any trouble and was close to his family. Ms. Kendall-Garner stated that it was brought before the jury that the petitioner "felt like he was in a haze" and that he had been taking cocaine and drinking.

As to the guilt phase, Ms. Kendall-Garner explained that the defense was that the cocaine and drinking was a one-night thing. The petitioner claimed that, because of the cocaine, he could not remember what had happened. In other words, the petitioner could not form the intent necessary to justify a first degree murder charge. She also stated that the petitioner never disputed the facts of the case.

Ms. Kendall-Garner stated that she and the petitioner had a very good working relationship. She asserted that the petitioner never voiced any objections to the way his case was being prepared. The people who were called to testify were the people he wanted to testify. She affirmed that there was no indication from the petitioner or his family that there was any family history of mental illness or substance abuse. Ms. Kendall-Garner stated that she exhausted the information she received from Janice White's notes and from conversations with the petitioner and his family. There was nothing that led her to believe that there was any irregularity in his family that contributed to his conduct. She further affirmed that the petitioner had a verbal I.Q. of 73, a performance I.Q. of 85, and a full scale I.Q. of 77.

William Johnson testified that, at the time of his appointment in the petitioner's case, he had handled several capital trials. When asked how many of his capital cases actually went to trial, Mr. Johnson responded:

> Quite a few of them have went to trial. I can tell you statistically, the only people on death row, there was three I was co-counsel on and only one I was lead counsel on death row, and I won all the rest of them, so you have no record of them, because I won them all.

Mr. Johnson further stated that he was "death qualified . . . by the Tennessee Supreme Court." He stated that he could not recall what he did in this case nor could he recall the facts of

the case. He did state that he met with the petitioner on several occasions. He stated that, as Janice White had originally been appointed to represent the petitioner, a "lot of the leg work had already been done."

Regarding voir dire, Mr. Johnson stated that he could not recall whether the defense used all their peremptory challenges. He stated that he handled the penalty phase of the trial because Ms. Kendall-Garner had no prior experience and he had handled many. He stated that, in preparing for the penalty phase, they used everything that they deemed relevant. In this regard, he explained that "[i]f it meant crying before the jury, that's what we did. If it meant putting him on the stand for him to beg for his life, that's what we did." However, Mr. Johnson conceded that he did not interview any witnesses personally. He added that Janice White had obtained the petitioner's birth certificate and school records during her representation.

On cross-examination, Mr. Johnson affirmed that the petitioner never denied that he committed the crime. Mr. Johnson stated that the State's plea offer was explained to the petitioner. Specifically, he explained that "you can always work your way out of a life sentence, but if you get death, it's very difficult to work your way out." It was Mr. Johnson's opinion that the petitioner did not want to accept the plea because he "thought he was going to pull a rabbit out of the hat. . . ." Mr. Johnson also discussed the plea offer with the petitioner's mother. He recalled that the petitioner ultimately made the decision not to accept the guilty plea offer. He further stated that it would be impossible to sell the petitioner's theory to the jury that the gun accidentally discharged five times. He stated that they would have lost all credibility with the jury if they had attempted this theory.

Mr. Johnson testified that there were no factors that led him to believe that an expert was necessary to explain the petitioner's behavior. The petitioner was an average student; there was nothing unique about him. The petitioner's family indicated that he was not a troublemaker and did not indicate he was having any problems. Mr. Johnson also explained that he did not find the petitioner's neighborhood especially relevant. He stated that lead counsel grew up in the same neighborhood. Mr. Johnson further opined that the problems of family members were not relevant unless they were directly related to the petitioner.

Mr. Johnson agreed that mitigation evidence could be positive. He stated the defense team attempted to introduce positive mitigation evidence. They attempted to show the redeeming social qualities of the petitioner: that his family loved him and that his life was worth saving.

Jack Chalmers testified that he was one of six siblings and that the petitioner was his brother. He explained that all his siblings lived in Memphis with the exception of one brother, Randy, who joined the military and was stationed in Colorado. Jack Chalmers did explain that he has not seen his brother, Clyde, in about fifteen years and was unsure of his location. He stated that Clyde Chalmers had gotten into trouble and that he just tried to forget about him. Specifically, Clyde Chalmers had been accused of murder.

Jack Chalmers stated that Johnny and Clytee Chalmers were his parents. Both parents lived in the home, although there were times when his father would go away for a few days at the time. He described his father, Johnny Chalmers, as a "roamer." Jack Chalmers further explained that his father was a gambler, who had two or three children with another woman. The petitioner has met his half-siblings and their mother.

Jack Chalmers stated he grew up in what is known as South Memphis and attended Alton Elementary, Longview Elementary, Longview Junior High, and Southside High School. He described the neighborhood as "pretty rough." He explained that by "pretty rough," he meant that there was gun fire, prostitutes and drugs. He said they heard gun shots every day. Jack Chalmers stated that he was shot in 1990.

Jack Chalmers described his younger brother, the petitioner, as a very quiet, happy child. However, he stated that "[y]ou could tell that he was little odd . . . a little different." He explained that the petitioner was not out-going and preferred to be alone. Jack Chalmers testified that the Chalmers' children "took care of one another" and that they were an average family. He described them as "basically just happy."

Jack Chalmers related that the petitioner had two children of his own, "Little Tyrone will be twelve and Tyeshia will be thirteen." "Little Tyrone's" mother was Pamela, and Tyeshia's mother was Keesha. The petitioner and Keesha's romance was "like a high school crush." Jack Chalmers related that, at first, the petitioner denied that Tyeshia was his child. Later, "[h]e came around and stepped up to the plate so to speak and took care of her." The petitioner lived with Pam and her mother. The petitioner took care of the entire household. Jack Chalmers stated that his brother really loved Pam. At this time, the petitioner was working as a welder at Zip Products, and Jack Chalmers worked at the same location. At some point, the petitioner and Pam ended their relationship. The petitioner was quite hurt by their break up, which was caused by another man.

Jack Chalmers stated that he was aware that his brother "drank occasionally and smoke a little marijuana." He stated that the petitioner had worked at Church's Chicken before being employed by Zip Products. Jack Chalmers could not recall talking with anyone from the petitioner's defense team. He stated that, if asked, he would have testified for his brother. He explained that he could not believe it when he learned that the petitioner had been arrested for murder. He explained that this was out of character for the petitioner.

Jack Chalmers related that their mother's health started to deteriorate during the 1980's. She has "been in comas, had strokes," and "forgets things." Once their mother's health began to fail, the family members had to take a more active role in her care. She had to be watched because she would forget to take her medication, and she could not be left alone to cook because she would forget to turn off the stove.

Jack Chalmers stated that the petitioner was not a bully; however, he would protect himself if necessary. He stated that the petitioner played football in school. He agreed that the petitioner never caused the family any problems, did well enough in school, maintained stable

employment, took care of his family and his children, and assumed responsibility for the care of their invalid mother.

Clytis Chalmers, the petitioner's sister, testified that their mother's health condition was poor at the time of the petitioner's trial. Prior to the petitioner's arrest, their mother had suffered a coma in 1987 and had been in the hospital several times. She explained that her mother's memory was affected by her medical condition. Clytis Chalmers explained that their father was often gambling or "visiting lady friends" and that the children were aware of their father's activities.

Clytis Chalmers explained that her only meeting with the petitioner's defense counsel took place briefly in the hallway during the trial. She stated that they did not ask about the family background and did not inquire as to the number of siblings.

Clytis Chalmers reiterated Jack Chalmers' description of their neighborhood. She added that one of her friends was raped and that her neighbor was shot by her boyfriend. She stated that the petitioner was only nine years old when their neighbor was shot. Clytis Chalmers added that, not only was their neighborhood violent, their schools were violent as well. There were many fights in the school yard, and she saw someone stabbed at the high school. She also recalled an instance when a dead body was found in a car.

Clytis Chalmers stated that the petitioner did not have an automobile. She stated that he was involved in a lot of fights at school and blamed this on the fact that the petitioner was "slow" and "was in resource." She explained that the petitioner would be teased because "he lacked knowledge," and this would lead to fights. The petitioner was embarrassed by the fact that he was "in resource." Clytis Chalmers testified that she would help the petitioner with his homework.

Clytis Chalmers stated that, in her opinion, the petitioner wanted to marry Pam. He was "really happy" when he learned that she was pregnant. She also described Pam as "conniving." She stated that the petitioner and his son, Tyrone, Jr., share the same birthday.

Robert Chalmers, another brother of the petitioner, testified that he was the youngest of the Chalmers' siblings. Robert Chalmers stated that they all lived together while they were growing up. He explained that their father was there for him when needed and that he could go to his father with any problem. There were times when their father was unavailable, but then Robert would talk with the petitioner, whom he described as caring and a "really nice guy all around." He conceded that he did observe his brother get "hot-headed" on a few occasions. He also stated that the petitioner got into a lot of fights while growing up, although Robert did not believe that the petitioner started any of these fights.

Their paternal grandmother stayed with them part of the time and in Mississippi part of the time. The petitioner adored their grandmother and was impacted by her death.

As did his other siblings, Robert Chalmers described their neighborhood as "rough." He stated that everything was "gang related," "[a]ll kinds of drugs," "it's just wild" and "lots of shooting." Notwithstanding, Robert Chalmers stated that he felt safe walking alone in his neighborhood.

Robert Chalmers recalled when the petitioner was shot. The petitioner came home and told Robert that he had been shot. Robert panicked. He was unable to contact police from his house, so the neighbor phoned the police for him. The injuries sustained from the gunshot interfered with the petitioner's plans to care for his family and to enter the military. Robert Chalmers also recalled that the petitioner's friend, Marcus Love, shot himself while they were still in school.

Robert Chalmers described Andre Ragland, the petitioner's co-defendant, as a "bad guy." He met Ragland through the petitioner. He also related that the petitioner drank alcohol and smoked marijuana. Robert Chalmers stated that, although he had heard that the petitioner had taken cocaine, he had never witnessed it. He stated that, once the petitioner began hanging around Andre Ragland, he spent all of his time with him.

Robert Chalmers testified that he was in jail on a robbery conviction at the time of the petitioner's arrest and was still incarcerated when the petitioner's case went to trial. He stated that no one asked him to testify for the petitioner.

Thelma House, a retired teacher, testified that she taught at Longview School in Memphis for eighteen years. In addition to being an educator, Ms. House also held degrees in guidance and counseling. She stated that the eighteen years were not continual; rather, Ms. House explained that she taught for thirteen years, left, and then returned for five additional years. Ms. House testified that Longview School was the first middle school in the City of Memphis and housed approximately seven hundred students in the fifth through the eighth grades. She stated that this was a "predominately . . . black school. . . some Hispanics and maybe just a little speckling of white students. . . ." Longview was a neighborhood school, and Ms. House described the neighborhood as "a relatively nice kind of neighborhood . . . not elaborate, but homeowners, the school sits right in homeowners." She continued that the economic background of the neighborhood was "a mixture." "There are some that lived in the area were professionals . . . but there were also common laborers."

Regarding her relationship with the petitioner, Ms. House admitted that he was never her student. However, she did have the opportunity to know the petitioner. Ms. House also taught the petitioner's sister, whom she described as a good student. She explained that the petitioner was having some difficulties at school, which caused concern. This resulted in some teachers taking a special interest in the petitioner. Ms. House stated that, despite the petitioner's difficulties, he was not a discipline problem.

Thelma House testified that the petitioner's sister, Clytis, was a good student. She stated that Clytis assisted other students and was dependable. Ms. House testified that the petitioner "did not read well" and "did not really speak well." She stated that the petitioner would accept

-12-

blame for things that he did not do. She stated that, when she learned of the petitioner's arrest, she was amazed. Ms. House affirmed that she was not aware that the petitioner was serving a death sentence until 2005. She stated that, had she been asked, she would have been "happy" to talk with anyone and would have testified on behalf of the petitioner.

Clara Hill, a retired teacher, testified that she taught in the Memphis Public School System for forty-six years. She stated that she taught the petitioner health during his seventh grade and eighth grade years. She described the petitioner as "a mild mannered student, very quiet acting, he was a follower and not a leader." Ms. Hill added that the petitioner "was in special ed." She stated that the petitioner showed exceptional interest in the units relating to stress and nutrition that she taught in her health classes.

Ruby Elmore, a seventh grade teacher with the Memphis City Schools, testified that she has been a teacher for almost thirty-five years. During this time, she had the opportunity to teach at Longview Middle School. Ms. Elmore stated that the petitioner was in her home room and in her seventh grade World Geography and her eighth grade American History classes. She added that the petitioner was on her school team, the SuperSonics.

Ms. Elmore related that the petitioner was in special education classes at Longview. As the petitioner's home room teacher, Ms. Elmore was part of the team that did his Individual Educational Program. As part of the petitioner's individualized plan, he did not take regular math, reading, or language arts classes. After reviewing the petitioner's educational records, Ms. Elmore affirmed that he had continued in special education classes through high school. She recalled that the petitioner had to repeat the first grade and that his standardized testing scores remained very low throughout his education. Ms. Elmore stated that, although the petitioner graduated from high school, he did so with a special education diploma, which is a certificate of attendance. She explained that there were only two tests to attain a certificate of attendance, the Tennessee Proficiency in Math and Reading. She added that the student was able to take this test many times. The petitioner first scored 53 and later scored 80. Ms. Elmore testified that the petitioner's score surprised her as she opined that his reading level was no more than a fourth or fifth grade level. His low reading level represented deficits in the areas of verbal skills and language processing.

Ms. Elmore explained that the students placed in the resource class were often humiliated and called names by the other students. She stated that this happened to any child placed in resource, including the petitioner. She described the petitioner as "passive," "shy," and "quiet."

Contrary to Ms. House's description of the neighborhood as "nice," Ms. Elmore described it as a "war zone." She explained that there was a lot of violence and gang recruitment. The teachers routinely looked for weapons. She stated that there were families and children in crisis. She added that "you had to be worried about standing outside . . . [y]ou didn't want to be shot." Ms. Elmore recalled two or three shootings at the school involving students who were being bullied into joining gangs.

Ms. Elmore described the petitioner's support system as the school, his mother, and his siblings. She stated that she was surprised when she learned of the petitioner's convictions and sentences. She added that she would have been willing to talk with the petitioner's defense team in 1996.

Shernard Wallace knew the petitioner his entire life. He grew up in the same neighborhood and attended the same schools. Mr. Wallace stated that it was "rough" growing up in their neighborhood. He described the neighborhood as violent and stated that he had witnessed robberies, killings, burglaries, and drugs. He stated that you could not avoid the drugs.

Mr. Wallace stated that the petitioner was "[p]retty cool to me." He affirmed that the petitioner as in "resource" classes and that this placement "mentally" affected the petitioner. He stated that he and the petitioner were very easily influenced. Mr. Wallace added that their role models were "drug dealers" and "thugs. He explained that "you could make a lot of money doing this . . . [y]our momma and them, they can't pay for it, you can get it doing this." Mr. Wallace stated that you would end up selling drugs to support your family. Mr. Wallace stated that, when he was eleven or twelve years old, he was robbed of his shoes and jacket on his way home from school. Mr. Wallace added that one of their friends, Marcus Love, lost his life playing Russian Roulette.

Mr. Wallace stated that he was not contacted by the petitioner's defense team prior to his trial in 1997. He stated that, if asked, he would have testified.

Orlando Coleman, Sr., testified that he met the petitioner in 1983. The two have a common interest in art, and Mr. Coleman now considers the petitioner as a brother. The petitioner was close with Mr. Coleman's grandmother, Ida. He described the petitioner as "a good person . . . he likes [sic] kids and senior citizens, I know a whole lot."

Mr. Coleman and the petitioner would walk to school together. They would sometimes take the long way to school on Lauderdale and Rosewood. There was a "group of guys that used to . . . loiter . . . one guy had something against [Mr. Coleman's] cousin." On one occasion, Mr. Coleman and the petitioner realized they were being followed by at least forty or fifty people. Mr. Coleman stated that he was afraid for his safety. He also recalled that a friend of theirs, Quentin Jamerson, was found dead in a vehicle. Mr. Coleman also related an incident where his brother, Anthony, was trying to make a firing pin for his sawed-off shotgun out of a piece of a fence. At some point, the gun went off, sending shrapnel into the petitioner's leg and blowing off three of Anthony's fingers.

Mr. Coleman was aware of the incident leading to the petitioner's arrest and ultimate convictions. He knew the co-defendant, Andre Ragland, and stated that he never heard anything positive about him. Mr. Coleman was surprised to hear of the petitioner's involvement. He stated that he was never contacted by the petitioner's defense team prior to his trial. He stated that, if asked, he would have testified.

Rodrequis Coleman stated that he grew up with the petitioner and is the uncle of Orlando Coleman. He described the petitioner as "a very nice person, real energetic." He explained that people, however, are intimidated by the petitioner's looks and size. Rodrequis Coleman stated that, while growing up, he and the petitioner were very close and that he frequently ate dinner at the petitioner's house. They remained friends after high school graduation. He knew Pam Rogers, the mother of the petitioner's child.

Both Rodrequis Coleman and the petitioner worked a summer job at the Pine Hill Community Center. They oversaw a group of children ages ten to fourteen years of age. The petitioner enjoyed working with the children. Mr. Coleman testified that Marcus Love was his best friend and that "[e]verybody took [Marcus Love's death] real hard."

He stated that he was never contacted by the petitioner's defense team prior to his trial and that, if asked, he would have testified.

Rodney Wickfall grew up and attended school with the petitioner. Mr. Wickfall, however, transferred out of Southside High School because he was involved in a fight. Mr. Wickfall's mother also "felt that our education at Southside wasn't as prosperous as other schools and she seen that our neighborhood was really changing a lot and so she wanted me to try going away from that environment." He explained that "[c]rack had hit and it was really, really kind of ugly. . . ." Notwithstanding his transfer to a different school, Mr. Wickfall returned to Southside for his senior year because he wanted to be with "people that I knew friends and stuff that I was affiliated with."

Mr. Wickfall recalled when a dead body was found in a car at school. He stated that "[w]e saw stuff like that all the time over at our school." He stated that he was never contacted by the petitioner's defense team prior to his trial but would have testified if he had been asked.

Patrick Haley worked with the petitioner at Zip Products, a steel company. He related that he was a press operator and that the petitioner was a welder. Because they did not have a car, Mr. Haley, the petitioner, and the petitioner's brother would walk to work together. Mr. Haley eventually earned a "social degree in childcare" and left his employment at Zip Products.

Mr. Haley knew the petitioner's family and would visit and eat with them. He also knew Pam Rogers and witnessed the petitioner's relationship with her. He described Pam Rogers as "the type of person [who] asked for more than what she's supposed to. . . ." Mr. Haley stated that the petitioner adored his son, Tyrone, Jr. Mr. Haley was of the opinion that the petitioner was a good role model. He also stated that he socialized with the petitioner and that they would drink together. He described them as "fringe drinker[s]," explaining that they did not drink during the week; only on weekends. In other words, he stated that they drank when they got paid.

Mr. Haley learned about the petitioner's arrest when he was home visiting from college. He was uncertain whether the petitioner was still with Pam at the time of the arrest. He stated

-15-

that he was never contacted by the petitioner's defense team prior to his trial. He stated that, if asked, he would have testified.

Cornelius Wells, another of the petitioner's co-workers at Zip Products, testified that he worked with the petitioner for approximately two and one-half years. He described the petitioner as a "consistent worker . . .[p]roductive." Mr. Wells never observed the petitioner drinking or taking drugs on the job. He stated that the petitioner was always sober when he came to work in the mornings.

Wells socialized with the petitioner outside of work. He stated that the two men would talk and drink. He never saw the petitioner use illegal drugs. He testified that the petitioner always talked about his son, Tyrone Jr. However, Mr. Wells did not know Pam and did not know about the petitioner's relationship with her.

He described the petitioner as "free hearted. . . helpful . . . a nice person." Notwithstanding, Mr. Wells stated that, "if someone pushed his button, I think he would defend himself very quickly." Mr. Wells stated that he drove the petitioner home on the day of his arrest. Mr. Wells was surprised to learn of the charges as it was out of character for the petitioner. He stated that he was never contacted by the petitioner's defense team prior to his trial and that, if asked, he would have testified.

Tim Irwin, the president of Zip Products, Inc. stated that Zip Products is a manufacturing business that does metal stamping, welding and fabrication. Mr. Irwin stated that "every one [of the Chalmers' family had] work[ed] for me. Of the four Chalmers' brothers, Mr. Irwin described "Johnny and Tyrone [as] the serious ones and Jack and Clyde were the happy go lucky ones. . . ." Mr. Irwin recalled that Clyde Chalmers was charged with murdering his girlfriend's grandmother. He has not seen Clyde since he failed to report that day. Mr. Irwin stated that he ended up firing Jack Chalmers because Jack was stealing from him.

Mr. Irwin characterized the petitioner as a good employee. He could not recall any specific instances of problems. Although there were a few notes in his employee file, Mr. Irwin stated that "just nothing really negative [stood] out." One day in 1994, the petitioner did not show up for work. Mr. Irwin recalled hearing that the petitioner was in jail. He stated that he was disappointed because he thought the petitioner had potential. Mr. Irwin testified that, in his opinion, the petitioner did not fit the "mold" of someone on death row.

Mr. Irwin stated that all of the Chalmers brothers were close with one another. He described Johnny Chalmers as the father figure of the bunch. He stated that he was never contacted by the petitioner's defense team prior to his trial. He stated that, if asked, he would have testified.

Herb Howard, another employee at Zip Products, testified that he first met the petitioner through his employment. He stated that the Chalmers' brothers were "quiet and wanted to work." Mr. Howard attended a barbecue at their home, and on this occasion, he witnessed the petitioner drinking. He stated that he never saw the petitioner use drugs. He was surprised to

learn that the petitioner was on death row. He stated that he was never contacted by the petitioner's defense team prior to his trial, but would have testified if he had been asked.

Dr. Keith Caruso, an expert in the area of forensic psychiatry and general psychiatry, was contacted to evaluate the petitioner for mitigation evidence. Dr. Caruso met with the petitioner on five occasions to gather information. He stated that he also liked to have a variety of information gathered before hand, including school records, health records, criminal records and family records. Dr. Caruso testified that the petitioner's school records, taken alone, triggered the need for further evaluation. He added that another important trigger is the petitioner's verbal I.Q. of 73, performance I.Q. of 85, and full scale I.Q. of 77. He explained that, with these scores, you have someone with border line intellectual functioning.

Dr. Caruso determined that neuropsychological testing was necessary to determine whether the petitioner had improved since his school years or whether he continued to have these deficits. Dr. Caruso testified that:

> . . .[t]here are multiple disadvantages that [the petitioner] had. I think he was born with. The intellectual deficits. He was raised in an environment where there was a lot of violence in addition, so that's going [to] be a stressor for him – when he's a victim of the violence that's going to certainly be worse, and then sustains a lot of losses.

He stated that Dr. Frantana, a neuropsychologist, examined the petitioner. As a result of Dr. Frantana's report, Dr. Caruso was able to conclude that the petitioner continued to have his deficits and also demonstrated further deficit, which was the attention deficit, hyperactivity disorder.

Dr. Caruso testified that delinquent behavior was common among several of the Chalmers' children. He stated that this history reveals that "impulsive behavior runs in families and . . . has a genetic basis." Additionally, the behavior may be a product of the family environment. He continued that, when you see that all of the males in the family have a problem with the law, one starts to wonder whether they also have problems with substance abuse and/or whether there is a genetic propensity for impulsive behavior.

Dr. Caruso stated that he gathered information revealing that the petitioner's father, Johnny, would "beat" the petitioner's mother. He stated that this information was relevant as the family dynamic is revealed. He stated that the absences of the petitioner's father from the family home was likewise relevant. Dr. Caruso asserted that people without a father figure in the home have difficulty in following rules and in dealing with authority.

The petitioner's environment, particularly the violence present in his neighborhood, similarly played an important role in the evaluation of the petitioner. Dr. Caruso commented that, if the streets were not safe, childhood games were not able to be played. The loss of the games translates into a loss of learning about life's lessons. The violence in the street also exposed the petitioner to the principle of violence as problem-solving and also "numbed" him to violence in general.

Dr. Caruso related that the petitioner stated that he felt "overwhelmed in the family." The petitioner was closest to his grandmother; he felt overlooked as the middle child and, thus, developed a special bond with his grandmother. Later in life, the petitioner became closest to his mother because he was caring for her. Dr. Caruso concluded that the petitioner did have some clear deficits.

As a result of his evaluation of the petitioner and the materials he was provided, Dr. Caruso made the following conclusions:

> . . . I think that he has chronic post-traumatic stress disorder. He also had dependence on cocaine or at least it's in remission now – had dependence on cocaine, on marijuana, and on alcohol. He had a proneness to depressing. He has a mixed receptive expressive language disorder, attention deficit hyperactivity disorder, borderline intellectual functioning, and in addition, he's got borderline personality disorder with anti-social features.

He continued:

> . . . [H]e is multiply disadvantaged. This is a guy with intellectual deficits who in addition has you know not had good role modeling, not been taught effective coping mechanisms, has been traumatized, suffered the los[s] of the person he was closest with, his grandmother, I believe also suffered the loss of a friend, was shot, various things, you know I think all of which are going to be quite a burden on him and the likelihood that this guy is going to succeed, I think is very, very low. In fact, I was somewhat surprised there wasn't a more extensive history of criminal behavior.

Dr. Caruso opined that the petitioner was very sensitive to loss and abandonment. He stated that, when the petitioner's relationship with Pam Rogers ended and he no longer had access to his son, this stressor brought back all the other losses. The petitioner looked for a way to deal with his pain and chose drugs and alcohol. Dr. Caruso stated that the petitioner was not very verbal.

At the time of the offense, the petitioner was in a downward spiral and was spending his time with persons who were dealing drugs. Dr. Caruso stated that the petitioner coped with his abandonment issues through substance abuse. Dr. Caruso further related that learning deficits and disabilities are associated with false confessions, as were psychiatric disorders and substance abuse. As the petitioner suffered all these deficits, Dr. Caruso concluded that a more thorough examination of his confession would have been wise. He similarly concluded that the deficits could have contributed to the petitioner's understanding of his Miranda rights and his vulnerability to law enforcement officers. Dr. Caruso added that, because of the petitioner's deficits, the petitioner's ability to assist his attorneys in his defense would be limited.

Regarding the petitioner's defense team, Dr. Caruso commented that the death of the petitioner's original counsel triggered another abandonment issue. This may have impacted the petitioner's ability to trust the next set of attorneys. Dr. Caruso commented that, had he been consulted by the defense team, he would have advised against the petitioner testifying on his own behalf. He explained that testifying at trial was stressful for the petitioner; this coupled with his other deficits and lack of coping mechanisms meant that the petitioner was unable to perform well.

-18-

On cross-examination, Dr. Caruso affirmed that, after the petitioner ended his relationship with Pam Rogers, he was using up to a quarter-ounce of cocaine daily and drinking very heavily. He affirmed that the petitioner began using marijuana regularly at the age of thirteen, often sneaking away from class to smoke in the bathroom. Dr. Caruso stated that the petitioner felt overwhelmed in crowds.

Dr. Caruso agreed that the version of the crime and the preceding robbery provided to him by the petitioner was the same version that the petitioner provided his defense counsel. When questioned as to what were the "anti-social features" of his diagnosis that the petitioner had a borderline personality disorder with anti-social features, Dr. Caruso referred to the petitioner's "unlawful behavior" and other "juvenile behavior," including a shop lifting incident.

The deposition of Calvin Vickers was introduced into the record. Mr. Vickers is retired from the Memphis City Schools. During his tenure as a teacher, Mr. Vickers taught metals technology at Southside High School. The petitioner was one of Mr. Vickers' students. He described the petitioner as "a little stubborn to start with, but he came around." He stated that the petitioner was a very good student.

Calvin Vickers stated that, regarding the demographics of the school, the school had very few, if any, white students. Most white students transferred before completing one year at the school. Other than these few white students, Mr. Vickers described the school as "a hundred percent black."

Mr. Vickers recalled visiting the Chalmers' residence on at least one occasion. He stated that he recalled hearing about the petitioner's arrest but stated that no member of the petitioner's defense team contacted him.

### Findings of Post-Conviction Court

On January 24, 2006, the post-conviction court entered an order denying relief. The court's findings of fact and conclusions of law are summarized as follows:

. . .

The petitioner contends trial counsel's representation was ineffective. Specifically, petitioner contends trial counsel failed to properly cross-examine certain witnesses at trial, failed to properly investigate petitioner's case and failed to present adequate mitigation including evidence[] of petitioner's alleged drug use, intellectual deficits; Post Traumatic Stress Disorder, and personality disorder.

. . .

This court finds petitioner has failed to demonstrate that he received ineffective assistance of counsel at trial. This court does not find that counsel's performance was deficient. There is no evidence that counsel failed to discover pertinent information about the petitioner's background or that counsel failed to adequately prepare for either the guilt/innocence phase of the trial or the sentencing phase of the trial. Both of petitioner's trial counsel explained that there

-19-

were strategic reasons for presenting or not presenting certain evidence, and this court finds no reason to second guess those decisions.

Much of the complaints raised by the petitioner revolve around mitigation proof. However, Mr. Johnson explained that during his twenty-five years of experience trying criminal cases and his considerable experience with death penalty cases, he had a sense for what type of mitigation evidence would be successful. Thus, he stated that he relied on that experience in making his decisions about what proof to put on in the sentencing phase of Mr. Chalmers' trial. In fact, certain family members did in fact testify at trial. Other family members were unavailable either due to illness or incarceration. Additionally, several remaining family members had at some point been incarcerated prior to trial. Moreover, much of the facts that petitioner claims should have been relayed during the sentencing phase, such as the absence of his father, simply do not appear to be accurate. Thus, this court will not fault trial counsel for failing to put on that proof.

Even if trial counsel was ineffective in failing to discover certain witnesses, present certain testimony or better evaluate certain documents relating to petitioner's past, this court finds petitioner was not prejudiced by trial counsel's alleged inaction. As previously mentioned, testimony from family members was presented during the sentencing phase of the trial. This court is unconvinced that trial counsel's failure to present testimony from incarcerated and ill family members or members with significant criminal histories was prejudicial to defendant.

Moreover, this court is not swayed by Dr. Caruso's testimony. Dr. Caruso's diagnosis of Post Traumatic Stress Disorder is suspect since much of his conclusion is based on an incident that was in fact an accidental shooting and did not involve violence. However, that is not the troubling part of the diagnosis; the troubling fact is that Dr. Caruso used the incident to make the diagnosis without actually knowing the underlying facts. Dr. Caruso was also unable to state from where he received information relating to alleged domestic abuse in petitioner's home. Apparently, this too made up a portion of Dr. Caruso's diagnosis, yet again he was unfamiliar with any particular incident of abuse and could not say who told him about the abuse, but could only say the information did not come from the defendant. This court is further unconvinced that Dr. Caruso's diagnosis of anti-social personality disorder and ADHD would have had significant mitigating effect.

Finally, despite petitioner's obvious learning disabilities, this court is skeptical of Dr. Caruso's opinion that petitioner was susceptible to providing false information or giving a false confession. Petitioner consistently relayed the same story about the events surrounding the murder to police, trial counsel, the jury and Dr. Caruso. Additionally, both of petitioner's trial counsel stated that

-20-

they did not have any difficulty communicating with the petitioner. Thus, this court finds that even if counsel was ineffective in failing to consult with a psychiatrist to determine the level of petitioner's mental and/or academic deficiencies, petitioner was not prejudiced by counsel's decision.

Therefore, having found petitioner's trial counsel provided adequate and competent professional assistance during both the guilt and penalty phases of his trial; and having further found that even if counsel's alleged inaction demonstrated ineffective representation, petitioner suffered no prejudice; petitioner's Petitioner for Post-Conviction relief, is hereby, DENIED.


## I. Standard of Review

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. Tenn.Code Ann. § 40-30-103 (2003). The petition challenging this petitioner's convictions is governed by the 1995 Post-Conviction Act, which requires that allegations be proven by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(2)(f) (2003). Evidence is clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from the evidence. Hicks v. State, 938 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Once the post-conviction court has ruled upon a petition, its findings of fact are conclusive on appeal unless the evidence in the record preponderates against them. Wallace v. State, 121 S.W.3d 652, 656 (Tenn. 2003); State v. Nichols, 90 S.W.3d 576, 586 (Tenn. 2002) (citing State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999)). This court may not reweigh or reevaluate the evidence or substitute its inference for those drawn by the post-conviction court. Nichols, 90 S.W.3d at 586. Questions concerning the credibility of witnesses and the weight to be given their testimony are for resolution by the post-conviction court. Id. (citing Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997)). It is, therefore, the burden of the petitioner to show that the evidence preponderated against those findings. Clenny v. State, 576 S.W.2d 12, 14 (Tenn. Crim. App. 1978).

Notwithstanding, determinations of whether counsel provided a defendant constitutionally deficient assistance present mixed questions of law and fact. Wallace, 121 S.W.3d at 656; Nichols, 90 S.W.3d at 586. As such, the findings of fact are reviewed under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001) (citations omitted). In clarifying the standard, our supreme court explained that the standard for reviewing the factual findings of a trial court has always been in accordance with the requirements of the Tennessee Rules of Appellate Procedure, specifically Rule 13(d). Id. at 456.

The petitioner complains that the post-conviction court made incorrect statements in its order denying the petition and in its summary of the testimony of the witnesses. Accordingly,

the petitioner asserts that this court should not apply the presumption of correctness to the lower court's findings of fact. He argues that this court must apply a de novo standard to both the findings of fact and the conclusions of law.

The petitioner cites as error in the post-conviction court's findings of fact numerous misstatements and/or a misleading summarization of facts. Specifically, the petitioner assigns as error the following statements of the post-conviction court:

1. "Having heard the testimony presented by both Chalmers and the State . . . ."
He asserts that the record reflects that the State did not present any proof other than its cross-examination of the petitioner's witnesses. The State asserts that it is clear from the reading of the lower court's order that this is standard language used in rendering post-conviction orders. We agree. A reading of the court's order does not reflect any proof presented by the State.

2. "When asked about her training, Garner testified that she had attended several seminars on death penalty litigation and that all of her continuing legal education courses where [sic] related to criminal law."
The petitioner asserts that the record "makes it clear that Ms. Garner was speaking of general criminal practice seminars where the death penalty was mentioned as opposed to seminars devoted to the defense of death penalty cases." Ms. Garner also conceded that she was unaware of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases nor was she aware of the three editions of the Tools for the Ultimate Trial, or any other manuals on death penalty defense. While the post-conviction court's statement was not entirely accurate, it was also not entirely inaccurate. Ms. Garner testified that she had attended seminars where death penalty litigation was discussed. She further stated that all of her CLEs were directly related to her criminal practice. The post-conviction court correctly summarized her testimony that this was Ms. Garner's first capital case. We agree with the State that the post-conviction's court summarization of Ms. Garner's testimony was only slightly inaccurate.

3. "With regards to her experience handling expert witnesses, Garner admitted that petitioner's case was the first criminal case where she had utilized expert testimony in the guilt phase of a trial."

4. "[Ms. Garner] stated that in approximately sixty percent of the criminal cases she has handled, she has utilized psychological testimony for the purpose of mental and/or competency evaluations."
The petitioner asserts that the defense did not use a single expert witness in either phase of his trial. He asserts that, not only did the defense not call an expert witness at the guilt phase, it did not call any witness during the guilt phase. The petitioner further asserts that the record reveals that Ms. Garner had never had an expert of any kind testify in a criminal case. Rather, Ms. Garner stated that her use of psychiatric or psychological experts in criminal cases had been limited to

determinations of competence to stand trial and sanity at the time of the offense. During the post-conviction hearing, Ms. Garner testified that she previously participated in a murder trial with Floyd Peete and Kenny Armstrong where an expert was used in the guilt phase. The State asserts that any error in the post-conviction court's findings of fact benefitted the petitioner. We agree and cannot conclude that the evidence preponderates against the lower court's findings.

5. "Next, Ms. Garner was questioned about a plea she negotiated from Mr. Chalmers on a pending murder charge which then became the aggravating factor used against him in the current case."
The petitioner asserts that Ms. Garner did not negotiate the plea for the petitioner in the Hunter case. This conviction was then used as the sole aggravating circumstance in the present case. Ms. Garner testified that the petitioner insisted upon entering the guilty plea in the Hunter case against Ms. Garner's advice. The charge was "attempt to commit especially aggravated robbery and attempt to commit first degree murder." The post-conviction court's findings are clear as to what case it was referring to, i.e, the Hunter case.

6. "With regard to trial preparation, Garner testified that she often consulted with Mr. Johnson who had handled many capital cases and testified that Mr. Johnson used an investigator to prepare certain materials for trial."
The petitioner asserts that the record is clear that no investigator was employed to assist in preparing for trial. The record does reflect that Ms. Garner consulted with Mr. Johnson, who had handled many capital cases. The record further reflects that Ms. Garner consulted with Ron Johnson of the Public Defender's Office, who was representing the co-defendant. Mr. Johnson had materials obtained by his investigator. We cannot conclude that the evidence preponderates against the post-conviction court's findings.

7. The petitioner next complains about the following statements made by the post-conviction court of co-counsel William Johnson:
-Johnson was "co-counsel at petitioner's trial;"
- "he had been practicing for twenty-five years;"
-"all of his practice had consisted of criminal work;"
-"he served on the Shelby County Public Defender's capital team for four years;"
-"by the time he handled Mr. Chalmer[s'] case, he had handled over ten capital cases;"
-"he met with Chalmers several times before trial;"
-"when Ms. Garner took over most of the investigation was complete;"
-"Ms. White had done much of the 'leg work;'"
-"he handled the voir dire process;"

-"When specifically asked about two jurors who were not struck from the jury, he stated that they were not challenged for strategic reasons."

The petitioner states that Mr. Johnson did not testify to having handled the voir dire. He also complains that Mr. Johnson's testimony did not contain the information in the remaining nine statements. The petitioner complains that "the court's summary grossly distorts the record and certainly cannot be relied upon to evaluate the performance of trial counsel." The record of the proceeding reflects that the post-conviction court's findings are an accurate reflection of the evidence introduced at the post-conviction hearing.

8. The petitioner next challenges the post-conviction court's summary of Dr. Caruso's testimony. The petitioner contends that the post-conviction court ignored the evidence before it. Specifically, the petitioner challenges the post-conviction court's characterization of Dr. Caruso's testimony in that Dr. Caruso was unaware of the accidental nature of the wound to the petitioner's buttocks. The record reveals that Dr. Caruso admitted that he was familiar with the evidence as to the accidental shooting injury. The record is unclear as to whether there were two shooting incidents or one. We adopt the State's position and cannot conclude that the post-conviction court was incorrect merely on the basis that the petitioner disagrees with the court's interpretation of the testimony.

The petitioner contends that the post-conviction court's findings of fact are not supported by the evidence and, therefore, should be reviewed de novo. We cannot conclude that the evidence preponderates against the post-conviction court's findings. Accordingly, the post-conviction court's findings are afforded the presumption of correctness.

## I. Ineffective Assistance of Counsel

### Legal Standard

The Sixth Amendment provides, in pertinent part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right. . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. This right to counsel is "so fundamental and essential to a fair trial, and so, to due process of law, that it is made obligatory upon the States by the Fourteenth Amendment." Gideon v. Wainwright, 372 U.S. 335, 350, 83 S. Ct. 792 (1963) (quoting Betts v. Brady, 316 U.S. 455, 465, 62 S. Ct. 1252 (1942)). Inherent in the right to counsel is the right to effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 344, 100 S. Ct. 1708 (1980); McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S. Ct. 1441 (1970); see also Strickland v. Washington, 466 U.S. 668, 686, 104 S. Ct. 2052 (1984).

"The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686, 104 S. Ct. at 2064;

-24-

Combs v. Coyle, 205 F.3d 269, 277 (6th Cir. 2000). A two-prong test directs a court's evaluation of a claim of ineffectiveness:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Strickland, 466 U.S. at 687, 104 S. Ct. at 2064; see also Combs, 205 F.3d at 277.

The performance prong of the Strickland test requires a petitioner raising a claim of ineffectiveness to show that counsel's representation fell below an objective standard of reasonableness or "outside the range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066; see also Kimmelman v. Morrison, 477 U.S. 365, 386, 106 S. Ct. 2574 (1986). "Judicial scrutiny of performance is highly deferential, and '[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Combs, 205 F.3d at 278. Upon reviewing claims of ineffective assistance of counsel, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged actions 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Additionally, courts should defer to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). Finally, it is acknowledged that criminal defendants are not entitled to perfect representation, only constitutionally adequate representation. Denton v. State, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" Burger v. Kemp, 483 U.S. 776, 794, 107 S. Ct. 3114, 3126 (1987). Notwithstanding, it is the duty of this court to "search for constitutional [deficiencies] with painstaking care" as this responsibility is "never more exacting than it is in a capital case." Id. at 785, 107 S. Ct. at 3121.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the Strickland test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In evaluating whether a petitioner satisfies the prejudice prong, a court must ask "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S. Ct. 838 (1993) (citing Strickland, 466 U.S. at 687, 104 S. Ct. at 2064). That is, a petitioner must establish that the deficiency of counsel was of such a degree that it deprived the petitioner of a fair trial and called into question the reliability of the outcome. Nichols, 90 S.W.3d at 587. For example, the evidence stemming from the failure to prepare a sound defense or to present witnesses must be significant, but it does not necessarily follow that the trial would have otherwise resulted in an

-25-

acquittal.  Nealy v. Cabana, 764 F.2d 1173, 1178-179 (5th Cir. 1985); Code v. Montgomery, 799 F.2d 1481, 1483 (11th Cir. 1986).  "A reasonable probability of being found guilty of a lesser charge, or a shorter sentence satisfies the second prong of Strickland."  State v. Zimmerman, 823 S.W.2d 220, 225 (Tenn. Crim. App. 1991); see also Chambers v. Armontrout, 907 F.2d 825, 832 (8th Cir. 1990), cert. denied, 498 U.S. 950, 111 S. Ct. 369 (1990).  Moreover, when challenging the imposition of a sentence of death, the petitioner must show that "there is a reasonable probability that, absent the errors of counsel, the sentencer . . . would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death."  Henley v. State, 960 S.W.2d 572, 579-80 (Tenn. 1997), reh'g denied, (1998), cert. denied, 525 U.S. 830, 119 S. Ct. 82 (1998) (citing Strickland, 466 U.S. at 695, 104 S. Ct. at 2069).

## A. Guilt Phase Deficiencies

The petitioner raises numerous complaints that trial counsel, Linda Kendall-Garner and William Johnson, failed to function as effective counsel as guaranteed by both the Tennessee and United States Constitutions.  In this regard, the petitioner asserts that trial counsel denied him effective assistance of counsel at the guilt phase of his capital trial by breaching acceptable standards for capital representation in that:
1. Counsel was not qualified to handle a capital case;
2. Counsel failed to develop a theory of defense;
3. Counsel failed to expose biases prejudicial to the petitioner during voir dire;
4. Counsel failed to adequately pursue the suppression motion;
5. Counsel failed to use available resources;
6. Counsel delivered inadequate opening and closing arguments; and
7. Counsel failed to adequately cross-examine the State's witnesses.

### i. Counsel was not qualified to handle a capital case.

The petitioner contends that lead trial counsel was unqualified to handle a capital case. He cites to Ms. Kendall-Garner's failure to familiarize herself with the duties of defense counsel in a capital trial.  He contends that her lack of qualifications is exemplified by her failure to utilize an investigator in preparing for trial.  The petitioner also cites to Ms. Kendall-Garner's testimony that she had never used the testimony of an expert witness in the trial of a criminal case, she had not attended any specialized training for defense counsel in a death penalty trial, she was not aware of the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases nor was she aware of the Tennessee death penalty manual, Tools for the Ultimate Trial..

Ms. Kendall-Garner was appointed to represent the petitioner on January 29, 1996.  Her appointment was prior to the effective date of the standards for appointment of counsel contained in the current version of Rule 13, Rules of the Tennessee Supreme Court.  Prior to July 1, 1997, no qualifying criteria was specified as to lead counsel.  Moreover, while the American Bar Association (ABA) standards as to capital representation were in place at the time of the appointment and while it must be conceded that Ms. Kendall-Garner failed to satisfy all of the

suggested criteria established by the ABA, these guidelines are not binding upon the trial courts of this state. There is no authority that the aspirational qualifications of counsel in a capital trial set forth in the ABA standards or that the required qualifications of capital counsel set forth in Rule 13, Rules of the Tennessee Supreme Court, are constitutionally compelled. See generally Trent Starks v. State, No. W2005-02478-CCA-R3-PC (Tenn. Crim. App., at Jackson, Nov. 2, 2006), perm. to appeal denied, (Tenn. Mar. 5, 2007). The Fourteenth Amendment guidelines simply require the appointment of an attorney to a capital petitioner. While the Tennessee Supreme Court has put into place heightened requirements in Rule 13, including the requirements of two attorneys that meet certain specific eligibility criteria, the attorneys need not meet these stringent standards to pass constitutional muster. Id.

While the Sixth Amendment does not grant a defendant the right to counsel of his own choice, see Gregg v. Georgia, 428 U.S. 153, 96 S. Ct. 2909 (1976), it has become apparent that special skills are necessary to assure adequate representation of defendants in death penalty cases. See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases at 5.1. Notwithstanding this fact, there is no presumption that counsel is ineffective because of lack of experience in trying a particular kind of case. See Russell v. State, 849 So.2d 85, 122 (Miss. 2003). In other words, lack of experience does not equate to per se deficient performance. We refuse to conclude that mere allegations of inexperience automatically result in a finding of deficient performance. A successful claim of ineffectiveness requires more than just a showing that trial counsel was inexperienced. Rather, the petitioner must demonstrate with specificity that counsel made errors so serious that counsel was not functioning as counsel guaranteed the petitioner by the Sixth Amendment and that such errors prejudiced the defense. We proceed therefore to examine the petitioner's specific allegations of deficient performance.

### ii. Counsel failed to develop a comprehensive theory of defense.

The petitioner next complains that trial counsel failed to develop and pursue a comprehensive defense theory for the guilt/innocence phase of the trial. Ms. Kendall-Garner testified that the defense theory was that the petitioner was unable to form the intent to justify a first degree murder charge. This theory was based upon the petitioner's assertion that, due to his use of cocaine, he could not remember what had happened that evening. Ms. Kendall-Garner explained that the defense was that the cocaine and drinking was a one-night thing. Both Ms. Kendall-Garner and Mr. Johnson stated that the petitioner never disputed the facts of the case. Mr. Johnson further testified that it would be impossible to persuade the jury to accept the petitioner's theory that the gun accidentally discharged five times. He stated that, if they would have attempted this theory, they would have lost all credibility with the jury.

We are unable to conclude that the petitioner's trial counsel were ineffective based on this claim. The petitioner has not advanced any other reasonable theory of defense at the post-conviction hearing. Moreover, it cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics. Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982).

The petitioner has not met the requirements to be granted post-conviction relief on this issue.

### iii. Counsel failed to adequately conduct voir dire.

The petitioner makes numerous challenges regarding trial counsel's failure to competently select the jury. Included within the petitioner's challenges are his allegations that trial counsel did not adequately voir dire prospective jurors on their respective attitudes about the death penalty, including the failure to ask questions designed to reveal jurors' biases and questions regarding the jurors' ability to give effect to mitigating evidence. Additionally, he alleges that counsel failed to question two prospective jurors regarding the fact that they both worked for the Memphis City Schools. The petitioner contends that "the result of counsel's deficient performance was the absence of any assurance that the jurors who heard the case were able to follow the law and return a sentence less than death."

The petitioner asserts that trial counsel failed to elicit any information that would demonstrate a potential juror's views on mental illness, learning disabilities, or childhood trauma. He contends that counsel failed to so inquire as they had failed to adequately investigate his case to be aware that these issues were relevant. The petitioner also contends that trial counsel failed to "life qualify" the jury under Morgan v. Illinois, 504 U.S. 719, 112 S. Ct. 2222 (1992) (defendant must be permitted to voir dire jury to insure that jury will be able to consider and give effect to mitigation and consider life). He adds that the voir dire conducted did nothing to identify the ADP (automatic death penalty) jurors.

The ultimate goal of voir dire is to insure that jurors are competent, unbiased, and impartial. State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997), reh'g denied, (1998), cert. denied, 524 U.S. 956, 118 S. Ct. 2376 (1998); Cazes, 875 S.W.2d at 262. There is no constitutional right that a petitioner is entitled to have questions posed to the venire specifically directed to matters that conceivably might prejudice venire men against him. See Ristaino v. Ross, 424 U.S. 589, 594, 96 S. Ct. 1017, 1020 (citing Ham v. South Carolina, 409 U.S. 524, 527-28, 93 S. Ct. 848, 850 (1973)). Moreover, in the capital murder context, where the jury in the punishment phase must choose between life and death, several courts have held that not questioning as to whether a prospective juror can fairly consider a life sentence does not necessarily constitute deficient performance. Hartman v. State, 896 S.W.2d 94, 105 (Tenn. 1995); Stanford v. Parker, 266 F.3d 442, 453-454 (6th Cir. 2001); Commonwealth v. Morris, 546 Pa. 296, 684 A.2d 1037, 1042-43 (Pa. 1996).

This court has reviewed the transcript of the voir dire. We cannot conclude that the petitioner's trial was "fundamentally unfair." Each of the jurors ultimately impaneled made unqualified assertions that they could be fair and impartial. The transcript before this court does not demonstrate any fundamental unfairness in the conduct of the trial. Indeed, "where a juror is not legally disqualified or there is no inherent prejudice, the burden is on the [d]efendant to show that a juror is in some way biased or prejudiced." State v. Caughron, 855 S.W.2d 526, 539 (Tenn.), cert. denied, 510 U.S. 979, 114 S. Ct. 475 (1993). In the present case, the petitioner has failed to establish that he was not provided a trial cloaked with guarantees of fundamental

fairness. Accordingly, we cannot conclude that trial counsel was deficient in performing an adequate voir dire. This issue is without merit.

### iv. Counsel failed to adequately pursue the suppression motion.

Although defense counsel pursued the motion to suppress, the petitioner asserts that counsel's performance was deficient in that they "failed to challenge his statement on the basis of his language disabilities preventing a knowing and intelligent waiver and raising the possibility that his statement contained serious errors." The petitioner cites to original counsel's draft of a suppression motion on this basis.

At trial, defense counsel pursued the motion to suppress on the basis that the statement the petitioner gave to police was the result of coercion and force. At the post-conviction hearing, Ms. Kendall-Garner conceded that she was unaware that the petitioner had been diagnosed as having a developmental expressive writing disorder. She admitted that the issue of the petitioner's reading comprehension was never discussed in relation to his motion to suppress. Notwithstanding, Ms. Kendall-Garner maintained that there was no indication from the petitioner that his reading comprehension was relevant to the motion to suppress. Rather, the petitioner informed her that "he did give a confession. He did not say he didn't understand it nor did he say that it wasn't true." She stated that the petitioner's complaint was that the "police officers beat him on the head with a telephone book which he called the book of knowledge." While she admitted that brain damage or other disorder may affect the admissibility of a statement, she stated that they had no evidence that the petitioner had ever been diagnosed with any kind of brain injury that affected his ability to read or to understand or to verbalize his thoughts. She stated that, because the petitioner was a C-student, "no red flag" was raised that would have triggered her to look behind the school records. Trial counsel stated that the petitioner's version of the events provided to them was the same as the version of facts recited in his confession.

At the hearing on the motion to suppress, Sergeant Woods testified that he did advise the petitioner of his rights, did not coerce the petitioner, and did not suggest what answers the petitioner should provide. Lieutenant Nichols described the petitioner as reasonably intelligent. The petitioner testified that he understood his rights.

At the post-conviction hearing, Dr. Caruso related that the petitioner's learning deficits and disabilities are associated with false confessions as were psychiatric disorders and substance abuse. As the petitioner suffered all these deficits, Dr. Caruso concluded that a more thorough examination of his confession would have been wise. He similarly concluded that the deficits could have contributed to the petitioner's misunderstanding of his Miranda rights and his vulnerability to law enforcement officers. Dr. Caruso added that, because of the petitioner's deficits, the petitioner's ability to assist his attorneys in his defense would be limited. Notwithstanding Dr. Caruso's testimony, we consider the record as a whole, including the petitioner's testimony at the motion to suppress, and we cannot conclude that counsel was deficient in their chosen strategy of the motion to suppress.

-29-

### v. Counsel failed to use available resources.

The petitioner next complains that trial counsel were deficient for failing to make effective or timely use of legal resources available to them. In support of this allegation, the petitioner refers to Ms. Kendall-Garner's failure to request the appointment of co-counsel until the death notice had been pending for five months. The petitioner further asserts that trial counsel failed to request investigative or expert services.

During the post-conviction hearing, Ms. Kendall-Garner explained: "I had no facts available to me where I found a pressing need for an investigator in order to prepare for the trial." Mr. Johnson opined that there were no events or facts available to them that triggered the need for an expert.

While counsel has an affirmative duty to investigate, counsel has the duty to make reasonable investigations <u>or to make a reasonable decision that makes particular investigations unnecessary</u>. <u>Nichols v. State</u>, 90 S.W.3d 576, 587 (Tenn. 2002) (emphasis added) (quoting <u>Strickland</u>, 466 U.S. at 691, 104 S. Ct. at 2052). The petitioner has presented no proof to establish that an expert would have assisted the defense during the guilt phase. Likewise, the petitioner has failed to presented proof to show he would have been benefited during the guilt phase by an investigator. Accordingly, the petitioner is not entitled to relief on this issue.

### vi. Counsel delivered inadequate opening and closing arguments.

The petitioner contends that trial counsel were ineffective for (1) failing to include in their opening and closing argument an account of his substance abuse leading up to the offense and (2) failing to offer an explanation of the elements necessary to establish robbery.

Mr. Johnson testified that opening statement was not important and that he only makes an opening argument if the State makes one. He also stated that he never provides his theory of defense in the opening statement and never provides a summary of the potential proof because he does not want to promise something that he may not be able to prove. At the petitioner's trial, Mr. Johnson's opening statement was limited to asking the jury to keep an open mind and reminding them of the State's burden of proof. Mr. Johnson applied this same strategy to the opening statement of the penalty phase. Mr. Johnson's closing statements focused on the burden of the State in proving the elements of the crime beyond a reasonable doubt. Mr. Johnson's statement suggested that the confession was not voluntary and that the State had failed to prove intent. Mr. Johnson's closing statement during the penalty phase summarized the mitigating proof.

The right to effective assistance extends to opening and closing arguments. <u>See Bell v. Cone</u>, 535 U.S. 685, 701-02, 122 S. Ct. 1843 (2002); <u>Herring v. New York</u>, 422 U.S. 853, 865, 95 S. Ct. 2550 (1975). Nonetheless, counsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should sharpen and clarify the issues for resolution by the trier of fact, <u>id.</u> at 862, 95

S. Ct. at 2550, but which issues to sharpen and how best to clarify them are questions with many reasonable answers. Indeed, it might sometimes make sense to forgo closing argument altogether. See Bell, supra, at 701-02, 122 S. Ct. at 1843. Judicial review of a defense attorney's summation is, therefore, highly deferential and doubly deferential when it is conducted in hindsight. See Yarborough v. Gentry, 540 U.S. 1, 5-6, 124 S. Ct. 1, 4 (2003).

In the present case, counsel's opening argument implored the jury to keep an open mind and to acknowledge the presumption of innocence afforded the petitioner. During closing argument, defense counsel focused on the State's burden of proof and the weaknesses of the State's case, including the State's failure to establish intent and the fact that the petitioner's confession was not voluntary.

While we agree that counsel's antiseptic argument failed to set forth any facts of the petitioner's substance abuse, we cannot conclude that a different result would have occurred if counsel done so. Additionally, as the trial court properly instructed the jury as to the elements of the offenses, we cannot conclude that counsel's failure to explain the elements of robbery to the jury constituted prejudicial error. The petitioner is not entitled to relief on this claim.

### vii. Counsel failed to adequately cross-examine the State's witnesses.

The petitioner contends that defense counsel's cross-examination of the State's witnesses was "unprepared and woefully inadequate." He cites to counsel's failure to explore the victim's drug use and also refers to the fact that the "longest cross-examinations by counsel cover six pages of transcript."

First, we acknowledge that the brevity of counsel's examination of a witness does not equate to a per se ineffective examination. Next, the petitioner has failed to establish the relevance of the victim's drug use. The petitioner fails to establish how trial counsel's performance was deficient or that he was prejudiced thereby. The petitioner is not entitled to relief on this issue.

### B. Penalty Phase Deficiencies

The petitioner raises several complaints regarding trial counsel's performance during the penalty phase of his capital trial. Specifically, he contends that trial counsel, Linda Kendall-Garner and William Johnson, failed to function as effective counsel, as guaranteed by both the Tennessee and United States Constitutions, by breaching acceptable standards for capital representation in that:
1. Counsel failed to request certain jury instructions;
2. Counsel failed to object to testimony regarding the Hunter offense;
3. Counsel failed to object to State's closing argument regarding the Hunter offense; and
4. Counsel failed to properly investigate and prepare mitigation evidence.

### i. Counsel failed to request certain jury instructions.

The petitioner complains that trial counsel failed to file proposed jury instructions on jury unanimity and erred by waiving inclusion of identity instructions. The petitioner's identity was never at issue. The record of his trial reflects that the trial court provided the jury with an instruction on the identity of the petitioner. Without further articulation of the precise error of counsel by the petitioner, we cannot conclude that the petitioner has established deficient performance on this claim.

Likewise, he does not articulate the basis of the failed request for unanimity instructions or any objection to the instruction during the penalty phase. We reject any invitation to hypothesize as to the nature of the alleged error. Instructions that the verdict must be unanimous during the penalty phase have been upheld on appeal. See State v. Nesbit, 978 S.W.2d 872, 902-03 (Tenn.1998); State v. Brimmer, 876 S.W.2d at 87.

The petitioner has failed to establish that he was prejudiced by counsel; therefore, he is not entitled to relief on this claim.

### ii. and iii. Counsel failed to object to testimony regarding the Hunter offense and failed to object to the State's closing argument regarding the Hunter offense.

The petitioner complains that trial counsel were ineffective for failing to object to the State's inclusion of the facts underlying the aggravating circumstance in its case-in-chief at the penalty phase and for referring to these facts in closing argument. The Tennessee Supreme Court reviewed these issues under plain error and requested that the parties brief the issues. See Chalmers, 28 S.W.3d at 917. After review, our supreme court found any error to be harmless. Id. at 918-19. Although counsel failed to enter objections to this evidence and argument, with consideration of the supreme court's holding, we cannot conclude that the petitioner has established prejudice. (see infra).

### iv. Failure to Properly Prepare Mitigation Evidence

As characterized by the post-conviction court, the crux of the petitioner's request for relief focuses upon defense counsel's failure to properly investigate and prepare mitigation evidence for the penalty phase of the trial. The petitioner bases the root of counsel's derelict performance in their failure to thoroughly review the petitioner's school records. He contends that, although counsel was in possession of the petitioner's school records, they failed to interview any of the petitioner's former teachers, failed to obtain expert assistance to develop the information contained in the record and they took no action to use the information to develop mitigation. Additionally, the petitioner avers that defense counsel failed to explore his family history, the criminal records of his family members, and the neighborhood in which the petitioner was raised. The petitioner contends that trial counsel failed to interview his brothers and his neighbors. He also complains that counsel failed to visit his family home and failed to investigate his mother's medical history.

In the context of capital cases, a defendant's background, character and mental condition are unquestionably significant. "[E]vidence about the defendant's background and character is relevant because of the belief . . . that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837, 841 (1987); see Eddings v. Oklahoma, 455 U.S. 104, 113-15, 102 S. Ct. 869, 876-77 (1982); Lockett v. Ohio, 438 U.S. 586, 604-05, 98 S. Ct. 2954 (1978) (plurality opinion); Zagorski v. State, 983 S.W.2d 654, 657-58 (Tenn. 1998). The right that capital defendants have to present a vast array of personal information in mitigation at the sentencing phase, however, is constitutionally distinct from the question whether counsel's choice of what information to present to the jury was professionally reasonable.

There is no constitutional imperative that counsel must offer mitigation evidence at the penalty phase of a capital trial. Nonetheless, the basic concerns of counsel during a capital sentencing proceeding are to neutralize the aggravating circumstances advanced by the State and to present mitigating evidence on behalf of the defendant. Although there is no requirement to present mitigating evidence, counsel does have the duty to investigate and prepare for both the guilt and the penalty phase. See Goad, 938 S.W.2d at 369-70.

Although there is no absolute duty to investigate particular facts or a certain line of defense, counsel does have a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary. Strickland, 466 U.S. at 691, 104 S. Ct. at 2052. In determining whether counsel breached this duty, counsel's performance is reviewed for reasonableness under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from counsel's prospective at the time. Wiggins, 539 U.S. 523, 123 S. Ct. at 2527 (citations omitted). Counsel is not required to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing. Id. at 533, 121 S. Ct. at 2381. Neither is counsel required to interview every conceivable witness. Hendricks v. Calderdon, 70 F.3d 1032, 1040 (9th Cir. 1995). In other words, counsel's duty to investigate and prepare is not limitless. See Washington v. Watkins, 655 F.2d 1346 (5th Cir. 1981). Counsel's performance will not be found deficient for failing to unveil all mitigating evidence, if, after a reasonable investigation, nothing has put counsel on notice of the existence of that evidence. See Babbit v. Calderson, 151 F.3d 1170, 1174 (9th Cir. 1998) (citation omitted). In summary, "no particular set of detailed rules can satisfactorily take account of the variety of circumstances faced by defense counsel. Rather, "courts must judge the reasonableness of counsel's conduct on the facts of the particular case, viewed as of the time of counsel's conduct, and judicial scrutiny of counsel's performance must be highly deferential." Roe v. Flores-Ortega, 528 U.S. 470, 477, 120 S. Ct. 1029, 1034-35 (2000) (internal citations and quotations omitted).

To determine whether or not trial counsel were ineffective for failing to present mitigating evidence, the reviewing court must consider several factors.

1. The reviewing court must analyze the nature and extent of the mitigating evidence that was available but not presented. Goad, 938 S.W.2d at 371 (citing Deutscher v. Whitley, 946 F.2d 1443 (9th Cir. 1991); Stephens v. Kemp, 846 F.2d 642 (11th Cir. 1988); Cooper v. State, 847 S.W.2d 521, 532 (Tenn. Crim. App. 1992); State v. Adkins, 911 S.W.2d 334 (Tenn. Crim. App. 1994)).

2. The court must determine whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase of the proceedings. Id. (citing Atkins v. Singletary, 965 F.2d 952 (11th Cir. 1992), cert. denied, 515 U.S. 1165, 115 S. Ct. 2624 (1995); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913, 111 S. Ct. 1123 (1991); Melson, 722 S.W.2d at 421.

3. The court must consider whether there was such strong evidence of applicable aggravating factor(s) that the mitigating evidence would not have affected the jury's determination. Id. (citing Fitzgerald v. Thompson, 943 F.2d 463, 470 (4th Cir. 1991), cert. denied, 502 U.S. 1112, 112 S. Ct. 1219 (1992); Elledge v. Dugger, 823 F.2d 1439 (11th Cir. 1987), cert. denied, 485 U.S. 1014, 108 S. Ct. 1487 (1988)).

During the penalty phase, the petitioner presented the testimony of his mother and his sister. The petitioner also took the stand in his own behalf. Clytee Chalmers, the petitioner's mother, testified that the petitioner had never given her any trouble. She stated that she never had to take him to Juvenile Court and that he was a "manner able" child. She characterized him as a "good child." Clytee Chalmers testified that the petitioner graduated from Southside High School and that he was mainly a "C[] and B[]" student. She explained that she suffered from diabetes and that he took care of her. She added that the petitioner had five brothers and one sister. The petitioner was the only child that had ever had problems. On cross-examination, Clytee Chalmers conceded that the petitioner may have gone to Juvenile Court and she was not aware.

Clytis Chalmers characterized her brother as a "very caring person." She stated that he had been to Juvenile Court, but as the victim. She added that the petitioner was her best friend.

The petitioner testified that he was twenty-one years old when the offense occurred. He explained that, on the night in question, he had been taking crack cocaine and drinking alcohol. He stated that he could not recall what transpired that evening, stating that he "had went in a black stage." He stated that this was the first time he had used drugs. On cross-examination, he stated that he could not recall what kind of weapon was used and that he did not know how to operate it.

The only aggravating factor was the (i)(2) factor of a prior violent felony.

We summarize the mitigating evidence presented at the post-conviction evidentiary hearing as follows:

1. **Jack Chalmers, brother**: Jack Chalmers testified that their brother Clyde had been accused of murder and he had not seen him since. He stated that both their parents lived in the home, although their father would sometimes go away for days at a time. He described their father as a "roamer" and a gambler. He added that their father had two or three children with another woman. Jack Chalmers described their neighborhood as "pretty rough," explaining that there was gun fire, prostitutes and drugs. He stated that he was shot in 1990. Jack Chalmers described his younger brother, the petitioner, as very quiet and a happy child. However, he stated that "[y]ou could tell that he was little odd . . . a little different." He explained that the petitioner was not out-going; he liked to be by himself. Jack Chalmers testified that the Chalmers' children "took care of one another" and that they were an average family. He described them as "basically just happy." He stated that the petitioner had two children of his own. Jack Chalmers stated that he was aware that his brother "drank occasionally and smoke a little marijuana." He agreed that the petitioner never caused the family any problems, that he did well enough in school, that he maintained stable employment, that he took care of his family and his children, and that he assumed responsibility for the care of their invalid mother.

2. **Clytis Chalmers, sister**. She reiterated Jack Chalmers' description of their neighborhood. She added that one of her friends was raped and that her neighbor was shot by her boyfriend. She stated that the petitioner was only nine years old when their neighbor was shot. Clytis Chalmers added that, not only was their neighborhood violent, their schools were as well. There were many fights in the school yard, and she saw someone stabbed at the high school. She also recalled an instance when a dead body was found in a car. She stated that he was involved in a lot of fights at school. She blamed this on the fact that the petitioner was "slow," "[h]e was in resource." She explained that the petitioner would be teased because "he lacked knowledge," and this would lead to fights. The petitioner was embarrassed by the fact that he was "in resource."

3. **Robert Chalmers, brother.** Robert Chalmers explained that their father was there for him when needed and that he could go to his father with any problem. There were times when their father was unavailable, but then Robert would talk with the petitioner. He described the petitioner as caring and a "really nice guy all around." He conceded that he did observe his brother get "hot-headed" on a few occasions. He also stated that the petitioner got into a lot of fights growing up. The petitioner adored their grandmother. Her death impacted the petitioner. Robert Chalmers described their neighborhood as "rough." He stated that everything was "gang related," "[a]ll kinds of drugs," "it's just wild" and "lots of shooting." Notwithstanding, Robert Chalmers stated that he felt safe walking alone in his neighborhood. Robert Chalmers also recalled that the petitioner's friend, Marcus Love, shot himself while they were still in school. Robert Chalmers described Andre Ragland, the petitioner's co-defendant, as a "bad guy."

He met Ragland through the petitioner. He also related that the petitioner drank alcohol and smoked marijuana. Robert Chalmers stated that, although he had heard that the petitioner had done cocaine, he had never witnessed this himself. He testified that, at the time of the petitioner's arrest, he was in jail on a robbery conviction. He was still incarcerated when the petitioner's case went to trial.

4. **Thelma House, retired teacher**. Thelma House testified that Longview School was a predominately black school. She described the neighborhood as "relatively nice . . . not elaborate. . . ." She described the economic background of the neighborhood as "a mixture" of "professionals . . .[and] common laborers." Thelma House described the petitioner as having some difficulties in school but stated that he was not a discipline problem.

5. **Clara Hill, retired teacher**. Clara Hill characterized the petitioner as "a mild mannered student, very quiet acting, he was a follower and not a leader." She stated that the petitioner "was in special ed."

6. **Ruby Elmore, teacher**. Ruby Elmore testified that the petitioner was in her home room at Longview School. She affirmed that the petitioner was in some special education classes at Longview. She stated that the petitioner remained in special education classes in high school. Ms. Elmore stated that the petitioner had to repeat the first grade and that his standardized school test scores remained low throughout his educational career. She described the petitioner as "passive," "shy" and "quiet." Ms. Elmore described the neighborhood as a "war zone." She stated there was a lot of violence and a lot of gang recruitment.

7. **Shernard Wallace, friend**. Shernard Wallace and the petitioner grew up in the same neighborhood and attended the same schools. Mr. Wallace concurred that the neighborhood was violent and stated that he had witnessed robberies, killings, burglaries and drugs. He described the petitioner as "pretty cool" but explained that he was very easily influenced. Mr. Wallace stated that their role models were "thugs" and "drug dealers." He added that it was common to sell drugs in order to support your family. Mr. Wallace testified that Marcus Love, a close friend of the petitioner, was killed while playing Russian Roulette.

8. **Orlando Coleman, Sr., friend**. Orlando Coleman, Sr., stated that the petitioner was a "good person." He related the incident where the petitioner was injured by shrapnel from a sawed-off shotgun. He explained that this incident occurred when the petitioner's brother was trying to fashion a firing pin from a piece of a fence. Mr. Coleman stated that Andre Ragland, the petitioner's co-defendant, was not necessarily a good person.

9. **Rodrequis Coleman, friend**. Rodrequis Coleman described the petitioner as "a very nice person, real energetic." He stated that Marcus Love was his best friend and that everyone "took it hard" when he died.

10. **Rodney Wickfall, friend**. Rodney Wickfall affirmed that the neighborhood was not good. He stated that "crack had hit and it was . . . ugly." He related that a dead body was found in a car at school.

11. **Patrick Haley, co-worker**. Patrick Haley worked with the petitioner at Zip Products. He stated that he would walk to work with the petitioner and his brother. He stated that the petitioner adored his son, Tyrone, Jr. Mr. Haley testified that the petitioner was "a good role model." He explained that they were "fringe drinkers," meaning that he and the petitioner only drank on the weekends when they got paid.

12. **Cornelius Wells, co-worker**. Cornelius Wells worked with the petitioner at Zip Products. He described him as "a consistent worker . . . [p]roductive." Mr. Wells never observed the petitioner using illegal drugs. He stated that the petitioner was "a nice person."

13. **Tim Irwin, employer**. Tim Irwin testified that he is the president of Zip Products. He stated that every one of the Chalmers' brothers had worked for him. He recalled that Clyde Chalmers was charged with the murder of his girlfriend's grandmother. He said he had not seen Clyde Chalmers since the day he failed to report. Mr. Irwin stated that he fired Jack Chalmers for stealing from the business. Notwithstanding, Mr. Irwin characterized the petitioner as "a good employee."

14. **Herb Howard, co-worker**. Herb Howard socialized with the Chalmers' brothers outside of work. He stated that he never witnessed the petitioner using drugs.

15. **Dr. Keith Caruso, forensic psychiatrist.** Dr. Caruso testified that the petitioner's I.Q. scores indicated a person with borderline intellectual functioning. He opined that a review of the petitioner's school records alone triggered the need for further evaluation. Dr. Caruso testified that delinquent behavior was common in the Chalmers' family and stated that "impulsive behavior . . . has a genetic basis." The behavior could also be the result of the familial environment. Dr. Caruso opined that the absences of the petitioner's father, the neighborhood environment, and the family dynamic of the petitioner as the middle child were all factors relevant in evaluating the petitioner. Dr. Caruso concluded that the petitioner suffered from chronic post-traumatic stress disorder. He also has a dependence on cocaine, marijuana and alcohol. The petitioner has a proneness to depression and suffers from a receptive expressive language disorder, attention deficit hyperactivity disorder, borderline intellectual functioning, and a borderline personality disorder with anti-social features. Dr. Caruso opined that the petitioner's deficits, coupled with the lack of good role modeling and coping skills, placed such a burden on him that Dr. Caruso was surprised that the petitioner did not have a more significant criminal history. Dr. Caruso added that

the petitioner turned to drugs and alcohol as a coping mechanism. Dr. Caruso affirmed that, after the petitioner ended his relationship with Pam Rogers, he was using up to a quarter ounce of cocaine a day and drinking very heavily. He affirmed that the petitioner began regularly using marijuana at the age of thirteen, often sneaking off from class to smoke in the bathroom. Dr. Caruso agreed that the version of the crime and the preceding robbery provided to him by the petitioner was the same version that the petitioner provided his defense counsel. When questioned as to what were the "anti-social features" of his diagnosis that the petitioner had a borderline personality disorder with anti-social features, Dr. Caruso referred to the petitioner's "unlawful behavior" and other "juvenile behavior," including a shop lifting incident.

16. **Calvin Vickers, retired teacher.** During his tenure as a teacher, Mr. Vickers taught metals technology at Southside High School. The petitioner was one of Mr. Vickers' students. He described the petitioner as "a little stubborn to start with, but he came around." He stated that the petitioner was a very good student. Calvin Vickers stated that, regarding the demographics of the school, the school had very few, if any, white students.

The petitioner's complaints regarding trial counsel's failure to present sufficient mitigating evidence are intertwined with his complaints that counsel failed to complete a sufficient pre-trial investigation, and they cannot be entirely separated. We proceed to address the issues regarding the petitioner's allegations of deficient investigation as one issue. The petitioner presented sixteen witnesses at the post-conviction evidentiary hearing. With the exception of Dr. Caruso's testimony, the testimony of these witnesses can be broken down into three general areas: (1) the petitioner was a good, nice, and caring person, (2) the petitioner's neighborhood was crime-ridden, and (3) the petitioner was placed in special education classes.

At the petitioner's penalty phase, his mother and sister testified that he was a good and caring person. As to the numerous witnesses who testified at the post-conviction evidentiary hearing that the petitioner was a good person, this testimony was merely cumulative to the evidence at trial. Moreover, it is hard to imagine that testimony that the petitioner was a "good person" made by his family and friends would outweigh the aggravating circumstance that the petitioner had previously been convicted of a crime involving violence to the person.

Many of the witnesses at the post-conviction evidentiary hearing testified that the petitioner grew up in a "rough" and "violent" neighborhood. Defense counsel did not present any such evidence of the neighborhood environment during the penalty phase. At the post-conviction evidentiary hearing, both Ms. Kendall-Garner and Mr. Johnson testified that they were aware of the neighborhood in which the petitioner was raised. Ms. Kendall-Garner conceded that she was not aware of murders committed in the petitioner's immediate neighborhood. She stated that she never visited the petitioner's home. Moreover, she related that the fact that "the projects were five doors down the street" from the petitioner's home would not have raised any "red flags" to her because she, herself, grew up "five doors down the street" from the projects. Mr. Johnson testified that he did not find the petitioner's neighborhood

especially relevant. He explained that lead counsel, Linda Kendall-Garner, was raised in this same neighborhood.

Despite counsel's presumed familiarity with the petitioner's neighborhood, it appears almost improbable that counsel would not have visited the petitioner's neighborhood and made some attempt to interview neighbors and friends. While trial counsel maintained that they were attempting to humanize the petitioner and establish the side of him which was "endearing," there is simply no explanation why trial counsel would not have explored this type of standard mitigation testimony by visiting the petitioner's nearby family or neighborhood. See, e.g, State v. Davis, 872 So.2d 250, 257 (Fla. 2004).

Next, the petitioner faults counsel with failing to discover and present evidence that he was in special education classes. Within this claim, the petitioner asserts that had counsel fully reviewed and investigated his school records, they would have become aware of his deficits. Moreover, a thorough review of the petitioner's school records triggered the need for further evaluation by a medical expert. In this regard, the petitioner presented the testimony of Dr. Caruso, who concluded that the petitioner had chronic post-traumatic stress disorder, had a chemical dependence (cocaine, marijuana and alcohol), and suffers from a receptive expressive language disorder, attention deficit hyperactivity disorder, borderline intellectual functioning, and a borderline personality disorder with anti-social features.

In preparing for the sentencing phase, defense counsel met with the petitioner's mother and sister and discussed his academic performance. Ms. Kendall-Garner also discussed the petitioner's academic performance with previous counsel, Janice White. Ms. Kendall-Garner did not recall reviewing the petitioner's Memphis City School records or a report titled "Memphis City Schools Mental Health Center, Professional Report." She also did not recall reviewing the petitioner's "notice of placement, parent response to the division of special education." However, she stated that she reviewed something "familiar" to this when reviewing Janice White's files. Ms. Kendall-Garner testified that she did not find it remarkable that the petitioner was a C-student and further stated that "special education doesn't necessarily mean that you are not able to participate effectively in your defense." She conceded that she was unaware that the petitioner had been diagnosed as having a developmental expressive writing disorder. She commented that she was not of the opinion that a writing disorder was relevant as a mitigating factor. She stated that neither she nor Mr. Johnson considered having an educational specialist or someone with a psychological or psychiatric background examine the petitioner for mitigating evidence. She stated that they discussed the possibility but, based on the information she had, they did not see a need for a specialist.

When defense counsel totally fails to inquire into a petitioner's past behavior or life history in a capital case, counsel's conduct is deficient. See generally Gaskin v. Secretary, Dept. of Corrections, No. 06-12351, 494 F. 3d 997 (11th Cir.). Professional standards require sufficient investigation to compile a life profile of a defendant. A reasonable investigation is not an investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the benefit of hindsight, would conduct. The investigation must be reasonable under all the circumstances. Haight, 41 S.W.3d at 446 (internal

-39-

citations omitted). The focus of the inquiry must be on whether trial counsel's decision not to pursue evidence or defenses was objectively reasonable under all the circumstances. Wiggins, 539 U.S. at 523, 123 S. Ct. at 2535. The appropriate inquiry, then, is whether counsel's decision concerning the scope of investigation was itself reasonable. Wiggins v. Smith, 539 U.S. 510, 523 (2003) (emphasis in original). A petitioner who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial. Moawad v. Anderson, 143 F.3d 942, 948 (5th Cir. 1998) (internal quotations omitted); see also U.S. v. James, No. 05-059, 2007 WL 2323385, *8 (E.D. La. Aug. 10, 2007).

The petitioner relies upon the United States Supreme Court opinion in Wiggins v. Smith, 539 U.S. 510, 123 S. Ct. 2527 (2003). He argues that defense counsel was ineffective in failing to investigate his mental capacity and any mental illnesses despite clear indications of his below-average intelligence, stating that the Wiggins Court reviewed facts similar to those present in his case.

In Wiggins, the petitioner's attorneys failed to investigate and present mitigating evidence of his dysfunctional background despite having some information available to them in a presentence investigation report and social service records. These indicated that the petitioner had suffered severe physical and sexual abuse as a child, had an alcoholic mother, and was borderline retarded with an IQ of 79. See Wiggins, 539 U.S. at 516, 523, 123 S. Ct. at 2532-33, 2536. The Supreme Court held that, under Strickland, the concern was not whether counsel should have presented a mitigation case but whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself unreasonable. Id. at 2536. The Court concluded that, given the information in the presentence report and the social services reports, counsel's decision not to expand the investigation into Wiggins' life history fell short of professional standards, id. at 2536-38, and that Wiggins was prejudiced by counsel's failure. Id. at 2542-44. On the question of deficient investigative performance, the Court reiterated that strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation and that counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. Id. at 521, 123 S. Ct. 2527 (quoting Strickland, 466 U.S. at 690-91, 104 S. Ct. 2052). Applying those principles, the Wiggins Court explained that its principal concern in deciding whether counsel exercised reasonable professional judgment is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of Wiggins' background was itself reasonable. Id. at 522-23, 123 S. Ct. 2527 (emphasis in the original; internal quotation marks and citations omitted).

Thus, in determining whether the investigation by Wiggins' counsel was deficient, the Court did not consider whether counsel necessarily would or should have presented the undiscovered evidence at trial. Instead, the Court found the investigation deficient because (1) prevailing professional standards demanded a more thorough investigation into mitigation than counsel performed, id. at 524, 123 S. Ct. 2527; (2) the existing social services records that counsel did review contained leads that should have triggered further follow-up, id. at 525, 123 S. Ct. 2527; (3) counsel had no countervailing grounds to conclude that further investigation

would have been counterproductive or fruitless, id. at 525, 123 S. Ct. 2527; and (4) the failure to investigate thoroughly resulted from inattention, not reasoned strategic judgment. Id. at 526, 123 S. Ct. 2527.

Wiggins is distinguishable from the instant case. Merely conducting some investigation is not necessarily sufficient; in assessing the reasonableness of an attorney's investigation, a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further. Wiggins, 539 U.S. at 527, 123 S. Ct. at 2538. The evidence possessed by counsel in Wiggins is qualitatively different from the evidence present here. First, defense counsel in Wiggins possessed a psychologist's report indicating the petitioner had an IQ of 79, had difficulty coping with demanding situations, and had a personality disorder. Id. at 2536. Second, the petitioner's presentence report noted his misery as a youth, quoted his description of his own background as disgusting, and observed that the petitioner spent most of his life in foster care. Id. Finally, social services reports revealed that the petitioner's mother was a chronic alcoholic; that he was shuttled between foster homes and had emotional difficulties; that he had frequent, lengthy absences from school; and that, on at least one occasion, his mother left him and his siblings alone for days without food. Id. at 2537. In the present case, while counsel was aware of the fact that the petitioner had a verbal I.Q. of 73, a performance I.Q. of 85 and a full scale I.Q. of 77, there was no indication from the petitioner's family that he had anything but a happy, normal childhood. He lived in the same home as his mother and father. There was no indication of emotional difficulties or other traumatic events within the familial setting. In this case, trial counsel conducted some investigation into the petitioner's history, including his educational history. The petitioner's mother stated that the petitioner was a good student. Trial counsel testified that a C average student does not trigger further investigation. Notwithstanding these qualitative differences between the present case and Wiggins, we would be constrained to conclude that counsel was unreasonable in not pursuing further investigation into the petitioner's background.

Regarding Dr. Caruso's post-conviction diagnoses, we acknowledge that, if the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." Penry v. Lynaugh, 492 U.S. 302, 319, 109 S. Ct. 2934 (1989) (quoting California v. Brown, 479 U.S. 538, 545, 107 S. Ct. 837 (1987) (O'Connor, J., concurring)). "Even if evidence of a mental condition is not strong enough to convince a jury to accept an insanity or diminished-capacity defense, the evidence might cause that jury not to recommend a sentence of death." Schneider v. Delo, 85 F.3d 335, 340 (8th Cir. 1996) (citing Eddings, 455 U.S. at 113, 102 S. Ct. 869). Case law presents a spectrum of decisions concerning whether an attorney's failure to present mitigating evidence constitutes ineffective assistance. See Schneider, 85 F.3d at 340-41 (no ineffective assistance for failing to introduce evidence that defendant suffered from an attention-deficit disorder and insomnia); Guinan v. Armontrout, 909 F.2d 1224, 1229 (8th Cir. 1990) (same regarding an anti-social personality disorder); Hill v. Lockhart, 28 F.3d 832, 846-47 (8th Cir. 1994) (ineffective assistance for failing to introduce at

penalty phase evidence that defendant suffered from paranoid schizophrenia and reliance upon anti-psychotic drugs); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (same regarding defendant's bipolar disorder).

In the present case, trial counsel presented the testimony of the petitioner to reveal that his use of cocaine at the time of the crime impaired his ability. To prevail on a claim of trial counsel's ineffectiveness, both substandard performance and prejudice caused by the performance must be shown. Strickland v. Washington, 466 U.S. at 668, 104 S. Ct. at 2052. To meet the Strickland test, a defendant has the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the complained about conduct was not the result of a strategic decision. Id. at 688-89, 104 S. Ct. 2052. A defendant must demonstrate "a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. 2052.

The petitioner has failed to meet this standard. The question before us is whether, had the mitigating evidence presented at the evidentiary hearing been presented at trial, it is reasonably probable the outcome would have been different. We conclude not. The mitigating evidence consisted of the testimony of members of the petitioner's family, friends, teachers, and co-workers. These witnesses basically testified that the petitioner was a good person, that he was a nice person, and that he did not abuse drugs. They testified that he lived in a violent neighborhood and that he was placed in several special education classes. There was also the testimony of Dr. Caruso. Some of the testimony of the witnesses contradicted each other, for instance, testimony of the extent of the petitioner's substance abuse. In sum, the mitigating evidence was substantial. If it stood alone, this court may well conclude that the petitioner had established prejudice. It does not stand alone, however.

As the mitigating evidence was subject to substantial impeachment and potentially devastating rebuttal, the equation is altered. Even if a petitioner has a significant psychological disorder, the sentencing jury may conclude that the mitigation evidence was not sufficient to preclude the imposition of the death penalty when weighed against the aggravating evidence. Evidence of a petitioner's mental or psychological impairments may not be inherently mitigating or may not be mitigating enough to overcome the evidence in aggravation. A jury considering evidence of this nature at sentencing might view the information as either mitigating or aggravating, depending, of course, on whether the individual hearing the evidence finds that it evokes compassion or demonstrates possible future dangerousness. With consideration of the aggravating circumstance relied upon by the State, we cannot conclude that, had additional mitigating evidence been presented at trial, a sentence other than death would have been imposed. The petitioner is not entitled to relief on this basis.

## C. Ineffective Assistance on Appeal

The petitioner maintains that counsel, Ms. Kendall-Garner and Mr. Johnson, created an impression of lack of interest during their appellate representation of the petitioner. He cites to the failure of counsel to timely file a notice of appeal document on three separate occasions. Counsel failed to address the proportionality issue and were directed to brief the issue by this

court. Counsel also late-filed their brief with the Tennessee Supreme Court. In addition to this general lack of enthusiasm in their representation, the petitioner cites to the following specific areas of deficiency.

### i. Failure to Raise Appellate Issues

The petitioner complains that counsel only raised three issues on direct appeal, i.e., sufficiency of the evidence, the denial of the motion to suppress, and whether the court erred in permitting inflammatory evidence. The petitioner contends that counsel failed to raise the following issues on appeal:

1. Counsel failed to raise issue regarding the improper conduct of the State.
2. Counsel failed to challenge the constitutionality of the Tennessee death penalty statutes.

The petitioner contends in this post-conviction proceeding that the State improperly presented a detailed account of the facts underlying the petitioner's prior conviction and then relied upon these facts in closing argument. He asserts that counsel failed to challenge the State's actions on appeal. He also complains that counsel failed to challenge the constitutionality of the Tennessee Death Penalty Statutes.

The same principles apply in determining the effectiveness of both trial and appellate counsel. Campbell v. State, 904 S.W.2d 594, 596 (Tenn. 1995). A petitioner alleging ineffective assistance of appellate counsel must prove both that (1) appellate counsel acted objectively unreasonably in failing to raise a particular issue on appeal, and (2) absent counsel's deficient performance, there was a reasonable probability that the petitioner's appeal would have been successful before the state's highest court. See e.g., Smith v. Robbins, 528 U.S. 259, 285, 120 S. Ct. 746 (2000); Aparicio v. Artuz, 269 F.3d 78, 95 (2nd Cir. 2001); Mayo v. Henderson, 13 F.3d 528, 533-34 (2d Cir. 1994). To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of the issue. Carpenter v. State, 126 S.W.3d 879, 887 (Tenn. 2004) (citing Kimmelman v. Morrison, 477 U.S. 365, 375, 106 S. Ct. 2574(1986)). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Id. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. Id. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. Carpenter, 126 S.W.3d at 888 (citing United States v. Dixon, 1 F.3d 1080, 1083 (10th Cir. 1993)). Additionally, ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel.

Gray v. Greer, 800 F.2d 644, 646 (7th Cir.1986), established a test for determining whether counsel was deficient in Strickland terms for failing to raise particular claims on direct appeal, i.e, significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective counsel be overcome. Id. In Carpenter v. State, our

supreme court refused to hold that the Gray v. Greer standard was the conclusive test of finding deficient performance. Carpenter, 126 S.W.3d at 888. Our supreme court noted that the relative strength of the omitted issue is only one among many factors to be considered. Indeed, the court noted the numerous factors relied upon the Sixth Circuit Court of Appeals in evaluating appellate counsel's failure to raise issues. Id. The non-exhaustive list includes:

1) Were the omitted issues significant and obvious?
2) Was there arguably contrary authority on the omitted issues?
3) Were the omitted issues clearly stronger than those presented?
4) Were the omitted issues objected to at trial?
5) Were the trial court's rulings subject to deference on appeal?
6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
7) What was appellate counsel's level of experience and expertise?
8) Did the petitioner and appellate counsel meet and go over possible issues?
9) Is there evidence that counsel reviewed all the facts?
10) Were the omitted issues dealt with in other assignments of error?
11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

Carpenter, 126 S.W.3d at 888 (citing Mapes v. Coyle, 171 F.3d 408, 427-28 (6th Cir.1999)). Our supreme court did acknowledge, however, that the Sixth Circuit's final factor addresses the ultimate issue under the first prong of Strickland and is therefore not helpful in deciding whether appellate counsel's performance was deficient. Id. at 888-89.

Again, the petitioner complains that appellate counsel failed to raise issues concerning the constitutionality of the death penalty. We have elected to address these same issues in subsection III. However, as we conclude that these issues have been repeatedly rejected by the appellate courts of this state on numerous occasions, we cannot conclude that the petitioner was prejudiced by appellate counsel's failure to raise these issues on direct appeal. See e.g., State v. Odom, 137 S.W.3d 572, 600 (Tenn. 2004) (determining that the death penalty is not unconstitutional under international law); State v. Holton, 126 S.W.3d 845 (Tenn. 2004) (holding that a sentence of death does not violate due process where the indictment fails to include language of the statutory aggravating circumstances that elevate the offense to capital murder); State v. Hines, 919 S.W.2d 573, 582 (Tenn.1995), cert. denied, 519 U.S. 847, 117 S. Ct. 133 (1996) (concluding that unlimited discretion is vested in the prosecutor and that the death penalty was not imposed in a discriminatory manner). Further, the petitioner asserts no argument and cites no new authority requiring reversal of this precedent.

An appellate attorney is neither duty bound nor required to raise every possible issue on appeal. Carpenter, 126 S.W.3d at 887 (citing King v. State, 989 S.W.2d 319, 334 (Tenn. 1999)); Campbell v. State, 903 S.W.2d 594, 596-97 (Tenn. 1995). An attorney's determination as to the viability of the issues should be given considerable deference. Carpenter, 126 S.W.3d at 887; Campbell, 903 S.W.3d at 597. No prejudice resulted. The petitioner is not entitled to relief as to his claim that appellate counsel was ineffective.

We next address the petitioner's claim that appellate counsel was deficient for failing to

challenge the State's inclusion of the facts underlying the aggravating circumstance in its case-in-chief at the penalty phase and for referring to these facts in closing argument. Although not raised as an issue on appeal, the Tennessee Supreme Court reviewed these issues under plain error and requested that the parties brief the issues. See Chalmers, 28 S.W.3d at 917. After considering arguments by the parties, the Tennessee Supreme Court held:

> We have reviewed the record in this case and conclude that the prosecutor 's conduct does not mandate reversal under Bigbee. Hunter's testimony was relevant to respond to defense claims contesting identification of the defendant as the perpetrator of the prior offenses about which the clerk testified. See Cozzolino, 584 S.W.2d at 768. It was inappropriate, however, to introduce evidence of the facts and circumstances of those prior crimes that was not relevant to the identification issue. The prosecutor could have elicited testimony from Hunter limited to Hunter's ability to identify the defendant. Cf. State v. Dyle, 899 S.W.2d 607, 612 (Tenn. 1995) (holding that jury must be instructed that value of identification testimony may depend upon the witness's capacity and opportunity to observe the offender).
>
> As for the argument, this case is distinguishable from Bigbee. . . .
> During opening argument at the sentencing phase in this case, the prosecutor did not mention the facts or even the specific convictions involving the Hunter offenses. The prosecutor indicated only that the State would be relying on the aggravating circumstance that the defendant was previously convicted of one or more felonies, other than the present charge, which involved violence to the person. During closing argument, the prosecutor did refer to the circumstances of the Hunter offenses when he stated in pertinent part:
>
>> This man before you has been convicted of a crime that involved violence prior to this particular trial. We not only put on the clerk to show that, we brought the victim to show you the nature of that offense. This is not a violence where somebody gets hit or slapped, pushed or knocked down. This violence involves an individual, Mr. Hunter, coming home, a man appears on the street, wants to take his car or whatever or his life. And, proceeds to shoot at him fifteen times and hit him two times. He gets away, barely. Less than two hours after that, this particular offense occurs. I submit to you that we have proven beyond a reasonable doubt that the defendant has been convicted of an offense of violence prior to this particular offense.
>
> While it was proper to argue that Hunter's testimony had proven the aggravating circumstance beyond a reasonable doubt, the prosecutor engaged in improper argument by implying that the jury should consider the nature of the violence against the victim in the Hunter offenses. Cf. id. at 812 (holding that argument regarding victim of prior offense was improper). However, unlike Bigbee, the improper remarks in this case were not extensive. See also State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998). No curative measures were taken because the

-45-

defendant failed to object. See id. The intent of the prosecutor in introducing Hunter's testimony was not improper in that the prosecutor was responding to defense claims that the evidence of the prior convictions was insufficient with regard to identification of the defendant as the perpetrator. The impropriety was limited to the introduction of the details of the Hunter offenses. Moreover, unlike Bigbee, the argument here was improper only in the respect that it implied that the jury should consider the nature of the violence against Hunter. The proof of the aggravating circumstance, even excluding the inadmissible evidence, was considerable, and the mitigating evidence was slight. The inadmissible evidence and the improper argument, considered cumulatively, did not affect the jury's sentencing determination to the defendant's prejudice. See Bigbee, 885 S.W.2d at 812. Any constitutional error was harmless beyond a reasonable doubt. See id. at 809; see also State v. Howell, 868 S.W.2d 238, 260 (Tenn. 1993). Because we find no reversible error, we need not address the State's assertion that reversal is not warranted in light of Tenn. Code Ann. § 39-13-204(c) (Supp.1998). [FN4]

> [FN4] After sentencing in this case, Tenn. Code Ann. 39-13-204(c) was amended to add the following language:
> In all cases where the state relies upon the aggravating factor that the defendant was previously convicted of one (1) or more felonies, other than the present charge, whose statutory elements involve the use of violence to the person, either party shall be permitted to introduce evidence concerning the facts and circumstances of the prior conviction. Such evidence shall not be construed to pose a danger of creating unfair prejudice, confusing the issues, or misleading the jury and shall not be subject to exclusion on the ground that the probative value of such evidence is outweighed by prejudice to either party. Such evidence shall be used by the jury in determining the weight to be accorded the aggravating factor.
> Tenn. Code Ann. 39-13-204(c) (Supp. 1998).

Chalmers, 28 S.W.3d at 918-19. As our supreme court considered these issues sua sponte, directed both parties to brief the issues and thoroughly reviewed these claims on appeal, we are unable to conclude that the petitioner suffered prejudice as a result of appellate counsel's failure to raise these issues. The petitioner is not entitled to relief on this claim.

### III. **Constitutionality of the Death Penalty in Tennessee**

The petitioner raises numerous challenges to the constitutionality of the imposition of the death penalty. In essence, he asserts that his sentence of death must be vacated because the trial and appellate proceedings were rife with constitutional error. We agree with the State that these claims should have been raised in prior proceedings. Accordingly, the petitioner's claims are waived. See Tenn. Code Ann. § 40-30-106(g).

Notwithstanding, we present a cursory review of the issues presented to this Court.

A.  The petitioner alleges that the Tennessee death penalty sentencing statute and the imposition of the sentence of death in this state violate Amendments 5, 6, 8 and 14 to the United States Constitution, as well as Article I, sections 8, 9, 16, and 17; Article II, section 2; and Article XI, section 8 of the Tennessee Constitution. He complains that Tennessee's death scheme fails to meaningfully narrow the class of eligible defendants.  Specifically, the petitioner contends that Tennessee Code Annotated section 39-13-204(i)(2) is overbroad and contrary to the legislative intent regarding the use of prior convictions.

B.  The petitioner alleges that the appellate review process in death penalty cases is constitutionally inadequate.  He contends that the appellate review process is not constitutionally meaningful because the appellate courts cannot reweigh proof due to the absence of written findings concerning mitigating circumstances, because the information relied upon by the appellate courts for comparative review is inadequate and incomplete, and because the appellate courts' methodology of review is flawed.  This argument has been specifically rejected by our supreme court on numerous occasions.  See Cazes, 875 S.W.2d at 270-71; see also Harris, 839 S.W.2d at 77; Barber, 753 S.W.2d at 664.  Moreover, the supreme court has recently held that, "while important as an additional safeguard against arbitrary or capricious sentencing, comparative proportionality review is not constitutionally required."  Bland, 958 S.W.2d at 663.

C.  The petitioner complains that unlimited discretion is vested in the prosecutor as to whether or not to seek the death penalty. This argument has been rejected. See Hines, 919 S.W.2d at 582.  The petitioner contends that the unlimited discretion of the thirty-one elected District Attorneys General violates principles set out in Bush v. Gore, 531 U.S. 98, 121 S. Ct. 525 (2000).  This Court has previously considered and rejected this claim.  See David Keen v. State, No. W2004-02159-CCA-R3-PD (Tenn. Crim. App., at Jackson, June 5, 2006), perm. to appeal denied (Tenn.  Oct. 30, 2006).

D.  The petitioner also argues that execution by means of lethal injection violates his rights under Article I, Sections 8 and 16 of the Tennessee Constitution and Amendments 8 and 14 of the United States Constitution.  The petitioner submits that the process of lethal injection violates his state and federal constitutional rights against cruel and unusual punishment. Our supreme court has held that death by lethal injection is not constitutionally prohibited.  See State v. Robinson, 146 S.W.3d 469 (Tenn. 2004).  See also recognizes that this claim is foreclosed by the holding of our supreme court in Abdur'Rahman v. Bredesen, 181 S.W.3d 292 (Tenn. 2005), cert. denied, 574 U.S. 1147, 126 S. Ct. 2288 (2006).

E.  The petitioner complains that Tennessee's imposition of the death penalty violates United States treaties and, hence, the federal constitution's supremacy clause. It appears from the argument presented that the petitioner contends that the supremacy clause is violated when his rights under treaties and customary

-47-

international law to which the United States is bound were disregarded. Arguments that the death penalty is unconstitutional under international laws and treaties have systematically been rejected by the courts. See State v. Odom, 137 S.W.3d 572, 600 (Tenn.2004); State v. Robert Faulkner, No. W2001-02614-CCA-R3-DD, 2003 WL 22220341, at *31 (Tenn. Crim. App., at Jackson, Sept. 26, 2003), aff'd by, 154 S.W.3d 48 (Tenn. 2005). We see no viable reason to resolve this issue in a different manner in the present case. The petitioner is not entitled to relief on this issue.

F. The petitioner complains that capital defendants are prohibited from addressing jurors' popular misconceptions about matters relevant to sentencing, i.e., the cost of incarceration versus cost of execution, deterrence, method of execution. This argument has been rejected. See Brimmer, 876 S.W.2d at 86-87; Cazes, 875 S.W.2d at 268; Black, 815 S.W.2d at 179.

G. The petitioner argues that the death sentence is unconstitutional because it infringes upon his fundamental right to life and because the death penalty is not necessary to promote any compelling Tennessee state interest. This complaint, that his death sentence must be reversed because it violates his "fundamental right to life," is contrary to settled precedent as reflected in Cauthern, 145 S.W.3d at 629 (citing Nichols, 90 S.W.3d at 604; State v. Mann, 959 S.W.2d 503, 536 (Tenn. 1997) (Appendix); State v. Bush, 942 S.W.2d 489, 523 (Tenn. 1997)). Accordingly, the petitioner is not entitled to relief on this issue.

H. The petitioner asserts that his sentence of death violates the Due Process Clause, Article I, section 8 of the Tennessee Constitution and the Fourteenth Amendment to the United States Constitution. He argues that his indictment was flawed because the aggravating circumstances which made him eligible for the death penalty were not submitted to the grand jury nor returned in the indictment. The Tennessee Supreme Court has consistently rejected this argument by holding that aggravating circumstances need not be pled in the indictment. State v. Reid, 164 S.W.3d 286, 312 (2005); Leach, 148 S.W.3d at 59; Berry, 141 S.W.3d at 562; State v. Holton, 126 S.W.3d 845, 863 (Tenn. 2004); State v. Dellinger, 79 S.W.3d 458, 467 (Tenn. 2002). Our supreme court explained that "[t]he focus in Apprendi, Ring, and Blakely was on the Sixth Amendment right to trial by jury," and the Court "expressly declined to impose the Fifth Amendment right to presentment or grand jury indictment upon the States." Berry, 141 S.W.3d at 560. The petitioner is not entitled to relief on this issue.

## Conclusion

After a thorough review of the record and the law applicable to the issues raised herein, we conclude that the petitioner has failed to prove allegations contained in his post-conviction petition by clear and convincing evidence. The post-conviction court properly denied the petitioner relief. Accordingly, the judgment of the post-conviction court is affirmed.

-48-

_____
JOHN EVERETT WILLIAMS, JUDGE